# UNITED STATES OF AMERICA, UPON THE APPLICATION OF THE ATTORNEY GENERAL, AT THE REQUEST OF THE INTERSTATE COMMERCE COMMISSION, *v.* UNION STOCK YARD & TRANSIT COMPANY OF CHICAGO.

# CHICAGO JUNCTION RAILWAY COMPANY *v.* UNITED STATES.

## APPEALS FROM THE UNITED STATES COMMERCE COURT.

Nos. 621, 622. Argued October 24, 1912.—Decided December 9, 1912.

In view of continuity of operation, manner of compensation for, and performance of, services in connection with interstate transportation, the Union Stock Yard & Transit Company and the Chicago Junction Railway Company are subject to the terms of the Act to Regulate Commerce and must conform to its requirements in regard to filing tariff and also desist from unlawful discriminations to shippers.

The Interstate Commerce Act, as amended by the Elkins and Hepburn Acts, extends to all terminal facilities and instrumentalities.

Service that is performed wholly in one State is still subject to the Act to Regulate Commerce if it is a part of interstate commerce.

The duties of a common carrier in the transportation of live stock begin with their delivery to be loaded and end only after unloading and delivery, or offer of delivery, to the consignee. *Covington Stock Yards Co.* v. *Keith,* 139 U. S. 128.

The character of the service rendered in regard to carriage of interstate freight and not the manner in which the goods are billed determines whether the commerce is interstate or not; and so *held* that although neither the Stock Yard Company nor the Junction Railway Company issues through bills of lading, still, as the goods handled are in transit from one State to another, both corporations are engaged in interstate commerce.

Where two corporations, the controlling stock of both of which is owned by one holding company, operate jointly, one handling only the stock yard business and the other the business of transferring and switching cars containing freight in interstate transit, both are to be deemed railroads within the terms of the Act to Regulate Commerce and are subject to its requirements.

While the Act to Regulate Commerce excludes transportation wholly
within a State, a corporation owning a railroad and doing other
business in connection with freight in interstate carriage cannot, by
leasing the railroad to another company for a share of the profits,
exempt itself from the operation of the law.

A contract by an interstate carrier by railroad to pay a part of the cost
of the plant of one of its shippers who agrees only to handle goods
moved by it, *held* in this case to be an illegal discrimination and re-
bate under the Act to Regulate Commerce.

A shipper receiving a bonus from the carrier for erecting a plant on the
line of the carrier has an undue advantage over a shipper not receiv-
ing any bonus or a smaller bonus.

It is the object of the Interstate Commerce Act and the Elkins Act to
prevent favoritism by any means or device whatsoever and to pro-
hibit all practices running counter to the purpose of placing all
shippers upon equal terms.

192 Fed. Rep. 330, affirmed in part and reversed in part.

THE facts, which involve the application of §§ 2, 6 and
20, of the Interstate Commerce Act, and of § 1 of the
Elkins Act, to the Union Stock Yard & Transit Company
of Chicago and the Chicago Junction Railway Company,
are stated in the opinion.

*Mr. Assistant Attorney General Adkins* and *Mr. William
E. Lamb,* Special Assistant to the Attorney General, for
the United States, appellant in No. 621 and appellee in
No. 622:

The Stock Yard Company and the Junction Company
are common carriers engaged in the transportation of
property wholly by railroad from one State to another.

Both companies are engaged in the transportation of
property wholly by railroad from one State to another.

Property is in interstate commerce from its delivery
to the carrier for shipment into another State until it is
there delivered to the consignee.   *Coe* v. *Erroll,* 116 U. S.
517; *The Daniel Ball,* 10 Wall. 557; *Henderson* v. *New
York,* 92 U. S. 271; *Wabash R. Co.* v. *Illinois,* 118 U. S.

557; *Rhodes* v. *Iowa*, 170 U. S. 412; *Heyman* v. *Southern Ry. Co.*, 203 U. S. 270.

The commerce act specifically defines "railroad" and "transportation" to include all property and every instrumentality used, and every step taken in such interstate commerce. Section 1, act of June 29, 1906.

Both companies are engaged in transportation. Their activities are within both the judicial and legislative definitions.

It is immaterial if the distance be short or cars only be hauled. *M. P. Ry.* v. *Gwinn Co.*, 55 Kansas, 525.

Cars are the subject of carriage. *R. R. Co.* v. *R. R. Co.*, 109 Illinois, 135; *United States* v. *C. & N. W. Ry. Co.*, 157 Fed. Rep. 619.

A towboat may be engaged in interstate commerce. *Moran* v. *New Orleans*, 112 U. S. 69.

Such transportation is wholly by railroad and from one State to another. *Int. Com. Comm.* v. *C., N. O. & T. P. Ry. Co.*, 162 U. S. 184; *Southern Pac. Terminal Co.* v. *Int. Com. Comm.*, 219 U. S. 498; *United States* v. *Colo. & N. W. R. Co.*, 157 Fed. Rep. 321; *Leonard* v. *Kansas City &c. Ry. Co.*, 13 I. C. C. Rep. 573; *Standard Oil Co.* v. *United States*, 179 Fed. Rep. 614; *Denver & R. G. R. Co.* v. *Int. Com. Comm.*, 195 Fed. Rep. 968.

Both the Stock Yard Company and the Junction Company are common carriers.

Definition of common carriers. *Niagara* v. *Cordes*, 21 How. 7, 22; Redfield on Carriers &c., 1; *Dwight* v. *Brewster*, 1 Pick. 50; *Wiggins Ferry Co.* v. *R. R. Co.*, 107 Illinois, 450; *Gordon* v. *Hutchinson*, 1 W. & S. 285.

Carriers of live stock are common carriers. *Myrick* v. *Mich. Cent. R. Co.*, 107 U. S. 106; 5 Enc. Law (2d ed.), 428.

Under their charters and by reason of their activities, both corporations come within these definitions.

Each was organized as a railroad company. They cannot deny their charters. *Randolph* v. *Post*, 93 U. S. 502;

*Improvement Co.* v. *Slack*, 100 U. S. 648; *Union Trust Co.* v. *Randall*, 20 Kansas, 515.

Under the Illinois constitution they are common carriers. Art. 11, § 12.

The Junction Company was conceded to be a common carrier.

The properties of both companies are railroads and they are engaged in transportation within definitions of. Hepburn Act.

They hold themselves out to the general public to perform these services for hire. *Union Stock Yards Co.* v. *United States*, 169 Fed. Rep. 406.

The courts have held stock-yards to be common carriers engaged in interstate commerce. *United States* v. *Union Stock Yards*, 161 Fed. Rep. 919; aff'd, 169 Fed. Rep. 404; *United States* v. *Sioux City Stock Yards*, 162 Fed. Rep. 556; *Belt Ry. Co.* v. *United States*, 168 Fed. Rep. 542; *United States* v. *Illinois Terminal. Ry. Co.*, 168 Fed. Rep. 546; *McNamara* v. *Wash. Terminal Co.*, 37 App. D. C. 384. See also *Covington Stock Yard Company* v. *Keith*, 139 U. S. 128; *Walker* v. *Keenan*, 73 Fed. Rep. 755.

The Stock Yard Company and Junction Company are in reality partners and are but one system in the eyes of the law. *Meehan* v. *Valentine*, 145 U. S. 623; *Southern Pac. Terminal Co.* v. *Int. Com. Comm.*, 219 U. S. 498; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *United States* v. *Milwaukee Refrig. Transit Co.*, 142 Fed. Rep. 247; 145 Fed. Rep. 1007; and *Kendall* v. *Klapperthal*, 52 Atl. Rep. 92.

The payment under the Pfælzer contract would constitute a rebate, concession, and unlawful discrimination. Act to Regulate Commerce, §§ 2, 3; Elkins Act, § 1; *Int. Com. Comm.* v. *Reichmann*, 145 Fed. Rep. 235; *Thomas* v. *United States*, 156 Fed. Rep. 897; *United States* v. *Milwaukee Refrig. Transit Co.*, 142 Fed. Rep. 247; 145 Fed. Rep. 1007; *C. & A. Ry. Co.* v. *United States*, 156 Fed. Rep.

558; *United States* v. *D., L. & W. R. Co.*, 152 Fed. Rep. 269; *A., T. & S. F. Ry. Co.* v. *United States*, 170 Fed. Rep. 250; *Wight* v. *United States*, 167 U. S. 512; and *N. Y., N. H. & H. R. R. Co.* v. *Int. Com. Comm.*, 200 U. S. 398; *Armour Packing Co.* v. *United States*, 209 U. S. 71.

Such payment would, therefore, be unlawful on the part of the Stock Yard Company and the Investment Company, and the receipt thereof would be unlawful on the part of the Pfælzers. See cases cited *supra.*

The Commerce Court had jurisdiction of the bill. Sections 2 and 3, Elkins Law; §§ 2, 3 and 6, Act to Regulate Commerce.

The decree in appeal 621 must be reversed and that in appeal 622 affirmed.

*Mr. Ralph M. Shaw* for appellees in No. 621 and appellant in No. 622:

The Act to Regulate Commerce does not apply to all carriers or to all commerce.

For the purposes of this case, before a corporation is subject to the provisions of the act it must simultaneously be not only a common carrier, but one wholly by railroad, and also one engaged in the transportation of passengers or property from one State or Territory to another.

A common carrier by railroad wholly within one State can so transact its business as not to subject itself to the provisions of the Act to Regulate Commerce. *Cincinnati &c. Ry. Co.* v. *Int. Com. Comm.*, 162 U. S. 184, 191.

"The Junction Co." is not a common carrier subject to the provisions of the Act to Regulate Commerce, because it is not engaged in the transportation of passengers or property from one State to another. It lies wholly within one State; it does not issue bills of lading; it does not deal either with the consignor or the consignee with respect to either inbound or outbound freight; it does not receive as compensation for its services any proportion of a

through rate, otherwise known as a "conventional division of rates."

When it hauls with its own motive power any freight on its own tracks it receives a flat switching charge therefor irrespective of the origin or destination or character of the freight.

When foreign carriers use its rails, they pay to it a fixed trackage sum per car irrespective of the origin, destination or character of the freight or of the revenue derived therefrom. *Int. Com. Comm.* v. *C., K. & S. R. Co.,* 81 Fed. Rep. 783; *Int. Com. Comm.* v. *B. Z. & C. Ry. Co.,* 77 Fed. Rep. 942; *Gracie* v. *Palmer,* 8 Wheat. 605.

The relation of the Junction Company to freight cars loaded with interstate commerce, which it hauls with its own motive power from receiving tracks in Illinois to unloading platforms in Illinois, is analogous to and identical with the relationship of a tugboat to an incoming steamer.

A tugboat is not a common carrier. *The Steamer Webb,* 14 Wall. 406, 414; *The Margaret,* 94 U. S. 494; *The L. P. Dayton,* 120 U. S. 337; *The Propellor Burlington,* 137 U. S. 386; *The J. P. Donaldson,* 167 U. S. 599, 603.

The "Stock Yard Co." is not subject to the provisions of § 1 of the Act to Regulate Commerce because it is not a common carrier; nor engaged in the transportation of property or passengers from any point in one State to any point either in or without a State. *Kentucky & Ind. Bridge Co.* v. *L. & N. R. R. Co.,* 37 Fed. Rep. 567; *Cattle Raisers' Assn.* v. *Ft. W. & D. C. R. Co.,* 7 I. C. C. Rep. 513, 536.

When an act of Congress has been construed by the courts and thereafter the act is amended or reënacted, and the amendments do not affect in any way whatsoever the provisions so construed, thereafter the courts will assume that Congress has approved and adopted the judicial interpretation placed upon its language; also when a statute has been officially interpreted by the body charged

with its execution, and thereafter the act is amended, and the amendments of Congress do not in any respect change the particulars so interpreted, the courts will assume that Congress has approved and adopted such interpretation, irrespective of what the courts might have originally determined to be the correct interpretation. *United States* v. *Mooney,* 116 U. S. 104, 106; *Kepner* v. *United States,* 195 U. S. 100, 124; *The Abbottsford,* 98 U. S. 444; *Diaz* v. *United States,* 223 U. S. 442, 454; *Standard Oil* v. *United States,* 221 U. S. 1, 59; *N. Y., N. H. & H. R. R. Co.* v. *Int. Com. Comm.,* 200 U. S. 361, 401; *Copper Queen Mining Co.* v. *Arizona Board,* 206 U. S. 474, 479; *United States* v. *Falk,* 204 U. S. 143, 152; *United States* v. *Hermanos,* 209 U. S. 337.

The "Investment Company" is not subject to the provisions of § 1 of the Act to Regulate Commerce, because it is not a common carrier, nor engaged in the transportation of property or passengers from any point in one State to any point, either within or without the State.

Irrespective of what the decision of the court may be either as to the "Stock Yard Company," or as to "The Junction Company," the mere fact that "The Investment Company" owns shares of stock of the two companies does not destroy its identity or merge it into the identity of either of the other two companies. *United States* v. *Del. & Hud. Co.,* 213 U. S. 366; *Coal Belt Electric Ry. Co.* v. *Peabody Coal Co.,* 230 Illinois, 164.

The United States Commerce Court not only had jurisdiction to determine whether the assailed contract was or was not unlawful, but it was its duty to determine such question. Elkins Act, §§ 2, 3.

When the jurisdiction of a court of equity is invoked in good faith, the court will decide all of the questions presented by the case, even though it decides the jurisdictional question against the person invoking the jurisdiction. *Siler* v. *L. & N. R. R. Co.,* 213 U. S. 175; *Michigan*

*R. R. Tax Cases,* 138 Fed. Rep. 223; *Burton* v. *United States,* 196 U. S. 283; *Williamson* v. *United States,* 207 U. S. 425; *Hopkins* v. *Grimshaw,* 165 U. S. 342; *Ober* v. *Gallagher,* 93 U. S. 199; *United States* v. *Union Pac. Ry. Co.,* 160 U. S. 1; 2 Current Law, 623.

The Pfælzer contract is not illegal. It is made for the purpose of maintaining a desirable customer at the live stock market at the Stock Yards.

It is not made by a common carrier or on behalf of a common carrier with a shipper, nor is it based upon the transportation of any property whatsoever.

It has nothing to do with the rates charged or paid for the transportation of any property. *Willoughby* v. *Chicago Junction Railways Co.,* 50 N. J. Eq. 656.

The Interstate Commerce Act should be interpreted *in pari materia* with the Anti-trust Act. It should be held that a contract, not made by a common carrier subject to the Act to Regulate Commerce, is not prohibited by law if its main purpose and chief effect is to promote the lawful business of the parties making it. *Hopkins* v. *United States,* 171 U. S. 578; *Bigelow* v. *Calumet & Hecla Mining Co.,* 167 Fed. Rep. 704, 712; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *American Tobacco Co.* v. *United States,* 221 U. S. 106.

*Mr. Willard M. McEwen* and *Mr. Joseph Weissenbach,* filed a brief for appellees, Louis Pfælzer & Sons:

The making of donations to assist enterprises to aid the business of a corporation is a legitimate object of contract and is not against public policy. *Ellerman* v. *Chicago Junction Rys. Co.,* 49 N. J. Eq. 217; *Willoughby* v. *Chicago Junction Rys. &c. Co.,* 50 N. J. Eq. 656; *Richelieu Hotel Co.* v. *Milw. Encampment Co.,* 140 Illinois, 248, 263–264; *B. S. Green Co.* v. *Blodgett,* 159 Illinois, 169, 174; *Central Lumber Co.* v. *Kelter,* 201 Illinois, 503; *Northern Pac. R. Co.* v. *Spokane,* 56 Fed. Rep. 915; *S. C.,* 64 Fed.

Rep. 506, and cases cited; *McGeorge* v. *Big Stone Gap Imp. Co.*, 57 Fed. Rep. 262; *Vandall* v. *S. S. F. Dock Co.*, 40 California, 83; *People* v. *Eel River &c. R. R. Co.*, 98 California, 665; *Temple St. Ry.* v. *Hellman*, 103 California, 634; *Texas & St. L. R. R. Co.* v. *Robards*, 60 Texas, 545; *Whetstone* v. *Ottawa University*, 13 Kansas, 320; *Town Co.* v. *Russell*, 46 Kansas, 382; *Hasson* v. *Venango Bridge Co.*, 1 Pa. Dist. Rep. 521; *Leslie* v. *Lorillard*, 110 N. Y. 519; *Louisville & Nashville R. R. Co.* v. *Literary Society*, 91 Kentucky, 395.

Discrimination backed by a sound reason (as distinguished from motive) in a matter where an individual has no right to demand the privilege as a public service undertaken to be furnished by a carrier as such to all alike and which deprives him of nothing which he is entitled to, or subjects him to no disadvantage in the public service rendered to him, is not forbidden by the law. *Memphis Frt. Bureau* v. *Ft. Smith Ry. Co.*, 13 I. C. C. Rep. 1; *Int. Com. Comm.* v. *L. & N. R. Co.*, 73 Fed. Rep. 409; *Central Yellow Pine Assn.* v. *V. S. & P. Ry. Co.*, 10 I. C. C. Rep. 193; *United States* v. *Wells-Fargo*, 161 Fed. Rep. 606; *Int. Com. Comm.* v. *Alabama Ry. Co.*, 74 Fed. Rep. 715; *Cole* v. *Rowen*, 13 L. R. A. 848; *Donovan* v. *Pa. Ry. Co.*, 199 U. S. 278; *Gamble* v. *C. & N. W.*, 168 Fed. Rep. 164; *United States* v. *Oregon R. & Nav. Co.*, 159 Fed. Rep. 982; *Central Stock Yds. Co.* v. *L. & N. R. Co.*, 24 I. C. C. Rep. 339; 118 Fed. Rep. 113; 55 C. C. A. 63; 192 U. S. 568; *Hart* v. *Choctaw, Ok. & G. Ry.*, 118 Fed. Rep. 169; *Missouri P. R. Co.* v. *Nebraska*, 164 U. S. 404; *N. P. Ry.* v. *Railroad Comm.*, 28 L. R. A. (N. S.) 1021; *Int. Com. Comm.* v. *Alabama Midland R. Co.*, 168 U. S. 144; *L. & N. R. Co.* v. *Behlmer*, 175 U. S. 684.

What a donation is depends both upon its effect as to all concerned and the intention of the parties as to application. These are the elements of the discrimination and are questions of fact to be proved by the peti-

tioner. *Int. Com. Comm.* v. *L. & N. R. Co.*, 73 Fed. Rep. 409; *Int. Com. Comm.* v. *Alabama Midland R. Co.*, 168 U. S. 144, 170; *Root* v. *L. I. R. Co.*, 114 N. Y. 300; 4 L. R. A. 33; *Texas* v. *Int. Com. Comm.*, 162 U. S. 197; *Int. Com. Comm.* v. *Baltimore R. Co.*, 43 Fed. Rep. 37; *S. C.*, 145 U. S. 263.

The presumption is in favor of fairness and legality. *Int. Com. Comm.* v. *C. G. W. R. Co.*, 209 U. S. 108.

MR. JUSTICE DAY delivered the opinion of the court.

These are appeals from a decree entered by the Commerce Court in an action begun by the United States on the application of the Attorney General at the request of the Interstate Commerce Commission against the Union Stock Yard and Transit Company of Chicago an Illinois corporation (hereinafter called the "Stock Yard Company"), the Chicago Junction Railway Company, an Illinois corporation (hereinafter called the "Junction Company"), and the Chicago Junction Railways and Union Stock Yards Company, a New Jersey corporation (hereinafter called the "Investment Company"), and David Pfælzer, Abe Pfælzer and Jones L. Pfælzer, a copartnership doing business under the firm name and style of Louis Pfælzer & Sons. The bill sought to enjoin violations of §§ 2, 6 and 20 of the Interstate Commerce Act, as amended 24 Stat. 379, c. 104; 34 Stat. 584; 36 Stat. 539, c. 309 and of § 1 of the Elkins Law as amended 34 Stat. 584, c. 3591. Its prayer was that an injunction should issue to restrain the Stock Yard Company and the Junction Company from further engaging in interstate commerce until they had filed tariffs as required by § 6 of the act and to restrain the performance of a certain contract with the Pfælzers, and that the Stock Yard Company and the Junction Company be required to file the statements and reports provided by § 20 of the act.

The Commerce Court held that neither the Stock Yard
Company nor the Investment Company was a common
carrier, and that it had no jurisdiction to determine whether
the contract would amount to an unlawful discrimina-
tion or advantage, or rebate, and dismissed the bill as to
the Stock Yard Company and the Investment Company
and as to the Pfælzers. As to the Junction Company,
it held that it was a common carrier subject to the Inter-
state Commerce Act and obliged to file its tariffs as re-
quired by the statute. It further held that, since there
was no allegation in the bill that the Interstate Commerce
Commission had by general or special order required the
Stock Yard Company or the Junction Company to file
statements and reports under § 20, it could not issue man-
damus to make such statements and reports. 192 Fed.
Rep. 330.

The Government appealed from the dismissal of the
bill as to the Stock Yard Company, the Investment Com-
pany and the Pfælzers, which is case No. 621. It, however,
makes no contention against the holding of the Com-
merce Court as to the construction of § 20. The Junction
Company appealed from the decision of the Commerce
Court as to it, which appeal is case No. 622.

The correctness of the decision and decree of the
Commerce Court is submitted upon facts which are prac-
tically undisputed. The Stock Yard Company was in-
corporated under a special act of the legislature of Illi-
nois, February 13, 1865; Laws 1865, v. 2, p. 678, which
authorized it to locate, construct and maintain near the
southerly limits of the City of Chicago:

"  . . . All the necessary yards, inclosures, build-
ings, structures, and railway lines, tracks, switches, and
turn-outs, aqueducts, for the reception, safe-keeping,
feeding, and watering, and for the weighing, delivery, and
transfer of cattle and live stock of every description, and
also dead and undressed animals that may be at or pass-

ing through or near the city of Chicago, and for the accommodation of the business of a general union stock yard for cattle and live stock, including the erection and establishment of one or more hotel buildings, and the right to use the same;  . . .  to make advances of money upon such cattle and live stock, for freight or other purposes, as may become expedient.  . . ."

The charter further provided:

"That said company shall construct a railway, with one or more tracks, as may be expedient, from the grounds which may be selected for its said yards, so as to connect, outside of the city of Chicago, the same with the tracks of all the railroads which terminate in Chicago, the lines of which enter the city on the south between the lake shore and the southwest corner of said city,  . . .  and to make connections with such suitable sidetracks, switches, and connections as to enable all of the trains running upon said railroads easily and conveniently to approach the grounds selected for said yards, and may make such arrangements or contracts with such railroad companies, or either of them, for the use of any part or portion of the track or tracks of such company or companies which now is or hereafter may be constructed, for the purposes aforesaid, as may be agreed upon between the parties;  . . .  and to transport and allow to be transported thereon between said railroads and cattle yards, all cattle and live stock and persons accompanying the same to and from said yards, and may also transport and allow to be transported between the railroads entering said city,  . . .  freight and property of every kind as well as stock and cattle.  . . ."

After its creation it acquired real estate, constructed and operated stock yards, with a stock market, built a hotel for the accommodation of its patrons, and constructed in the stock yards district about 300 miles of railroad track consisting of main lines connecting with the

trunk lines entering Chicago and a large number of switches to the various industries which had been established adjacent to such tracks.

Prior to December 15, 1897, the Stock Yard Company carried on the stock yards and railroad business, and, although it had regular charges for the services it performed, it filed no tariffs with the Interstate Commerce Commission and concurred in none. On December 15, 1897, the Stock Yard Company leased all of its railroad tracks and equipment for a term of fifty years to a corporation known as the Chicago and Indiana State Line Company (hereinafter called the "State Line Company"), retaining for itself the loading and unloading platforms and facilities used in connection with its stock yards business. This lease covered all its railroad and railroad tracks, switches, etc.; roundhouse, repair shops, machine shops, coal chutes, etc., then in existence or theretofore used by the Stock Yard Company in connection with its railroad; and all and singular the equipment and the telegraph lines, instruments and appurtenances owned or possessed by the Stock Yard Company and used by it in conducting its railroad business. By the terms of the lease the State Line Company was given the right in the future to maintain and operate upon the lands of the Stock Yard Company additional side tracks and switch tracks and other appurtenances necessary to reach industrial plants.

Afterwards the State Line Company consolidated with the Chicago, Hammond & Western Railroad Company, and the consolidated company became known as the Chicago Junction Railway Company (defendant herein) and, in addition to the railroad leased from the Stock Yard Company, operated a belt line around the City of Chicago. In November, 1907, the Junction Company sold the belt line to the East Chicago Belt Railroad Company, retaining the tracks which had been leased by the Stock Yard Company. The equipment operated by the Junction

Company, consisting of locomotives and rolling stock, is owned by the Stock Yard Company, but the Junction Company employs its own engineers and crews.

The tracks of the Junction Company are frequently used by the trunk lines to connect the eastern and western systems and to deliver shipments originating without the State to the platforms of the Stock Yard Company, for which service they pay the Junction Company a trackage charge of a fixed sum per car. Large numbers of carload lots of dead freight from points without the State are placed on the receiving tracks of the Junction Company bearing transfer cards showing the destination of the cars, and the Junction Company delivers the cars either to the consignee, if situated on its tracks, or to the receiving track of the forwarding carrier. It is paid by the trunk lines a fixed charge for this service, which the latter absorb. The Junction Company upon the order of the trunk lines places cars for loading by shippers in the stock yards district and after they are loaded hauls them to the receiving tracks of the trunk lines, and it receives from the trunk lines a fixed amount for this service, which is absorbed by the latter. Less than carload lot freight is delivered at the freight depot known as the Union Freight Station and placed in cars by the Junction Company which transports them to the receiving tracks of trunk lines, and for this service the trunk lines pay the Junction Company five cents per hundred weight. Sometimes such freight is hauled from the industries in the stock yards district to the Union Freight Station by the Junction Company and distributed in the cars. The Junction Company receipts for the less than carload lot freight in the name of the trunk lines, such receipts being exchangeable for bills of lading at the office of the trunk lines, and all charges paid to the Junction Company are receipted for in the name of the trunk lines and remitted to them. The Junction Company has an arrangement with the Balti-

more & Ohio Railroad Company whereby it performs a like service for such company as to the less than carload lot freight brought by it to the Union Freight Station and destined to points beyond the State. Shipments of horses are transported by the trunk lines to the loading platforms of the Stock Yard Company and there picked up by the Junction Company and hauled to the unloading chutes for horses, and the Junction Company receives, besides the trackage charge, a certain amount per car for this service. A large part of the service thus performed by the Junction Company is in connection with interstate shipments. The Junction Company does not issue any bills of lading with respect to any kind of freight.

After leasing its railroad property to the Junction Company, the Stock Yard Company continued to operate its stock yard facilities for loading and unloading cattle and other live stock bound for and coming from points outside the State, and to feed and water live stock in transit over the lines of trunk line carriers, and also to feed, bed and water live stock shipped to consignees doing business in the stock yards district.

The employés of trunk lines bringing live stock to the stock yards turn over the waybills accompanying such shipments, with what are called "live stock stubs" attached, to the employés of the Stock Yard Company, who use the waybills in unloading and counting the stock, and the waybills and stubs are then sent to the auditor of the Stock Yard Company (being also the auditor of the Junction Company) who retains the stubs and forwards the waybills to the local agents of the trunk lines. The Stock Yard Company advances the charges on such shipments to the trunk lines and collects from the consignees, usually commission men doing business at the stock yards, the moneys it has so advanced for their accommodation.

The Junction Company publishes tariffs showing the charges which it exacts for its services, such tariffs being

in general circulation in Chicago, especially about the stock yards district, but they were not filed with the Interstate Commerce Commission.   Prior to 1907, the Junction Company, while owning railroad facilities in Indiana, had filed tariffs with the Interstate Commerce Commission, but upon the sale of such properties cancelled the tariffs.   It was the belief of the Government and of the Junction Company that all tariffs and concurrences had been cancelled, but it is shown by a stipulation which the parties have filed that since the issues were made up it has been discovered that one particular concurrence through inadvertence was not cancelled.

The Investment Company is a holding company and owns over ninety per cent. of the shares of the Stock Yard Company and practically all of the shares of the Junction Company.

As to the contract with the Pfælzers: They were members of a copartnership (since incorporated) engaged in the slaughtering business, their plant being located in the vicinity of the tracks operated by the Junction Company and the cattle pens of the Stock Yard Company.   They purchased cattle from time to time outside the City of Chicago and in States other than Illinois and shipped them to the partnership at the stock yards, where they were handled as hereinbefore stated for delivery to the consignee.   The freight charges on such business averaged for the five years prior to the filing of the Pfælzers' answer about $2,800 annually.   The amount of freight consigned to the Pfælzers tends to increase the business of the Stock Yard Company and the Junction Company and therefore the revenue of each.

In 1906 the Department of Agriculture required the Pfælzers to make changes in their plant; in 1908 it directed them to erect a new plant, and in 1909 they were notified that the Government would deny to them further inspection of the products of their plant.   They then proposed

to locate in Kansas City, Missouri, but upon negotiation with the Stock Yard Company made the contract under consideration here. This contract provided that upon the erection by the Pfælzers of a modern slaughtering, packing and canning plant adjacent to the stock yards in Chicago, costing a certain sum and having a required capacity, the Stock Yard Company would pay them $50,000, and the Pfælzers agreed that all live stock slaughtered or canned by them within a radius of 200 miles would either be purchased at such stock yards or pass through and use them, the customary yardage, tolls and charges to be paid thereon, or that the Pfælzers would pay full tolls and charges on live stock the same as if it had been sent to the stock yards for sale and had there been bought by them; and that for fifteen years they would conduct all their slaughtering, packing and canning business at such plant and not interest themselves directly or indirectly in any other plant or in any other stock yards. The Investment Company guaranteed the performance of the contract by the Stock Yard Company.

It is stated in the answer of the Stock Yard Company and stands admitted in the case that there are other competitive stock yards in the United States which have built up their business in competition with it by offering and giving inducements, either in the shape of land or money, to packing houses and other industries to locate at or near their yards.

From this statement it is apparent that the Stock Yard Company was organized for the purpose of maintaining a stock yard, with the usual facilities of such yards as to loading and unloading and caring for freight, and it was authorized to and did own and operate a railroad system, transporting cars to and from trunk lines in the course of their transportation from beyond the State and to points outside of the State. This service, so far as the railroad

and its operation is concerned, is now performed by the Junction Company. The Stock Yard Company still continues to perform the customary stock yard operations, but by means of the lease to the Junction Company it has divested itself of the operation of the railroad system which it was authorized by its charter to construct and operate and which for many years before the lease it did in fact operate. The Stock Yard Company, under the lease, still gets, however, two-thirds of the profits received by the Junction Company for performing the service in connection with the railroad transportation. This joint service now takes the place of the single service formerly rendered by the Stock Yard Company. The stock of both these companies is held in common ownership by the Investment Company, and it appears that the Investment Company guarantees the contracts, or at least some of them, of the Stock Yard Company.

In view of this continuity of operation, the manner of compensation and the performance of services in connection with interstate transportation by railroads such as are described, are the Stock Yard Company and the Junction Company subject to the terms of the Act to Regulate Commerce and bound to conform to its requirements?

The Interstate Commerce Act, as amended by the Hepburn Act, 34 Stat. 584, c. 3591, § 1, applies to common carriers engaged in the transportation of persons or property from State to State wholly by railroad, and the term railroad is defined to include "all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, and also all freight depots, yards, and grounds used or necessary in the transportation or delivery of any of said property"; and transportation is defined to include "cars and other vehicles and all instrumentalities and facilities of shipment or carriage,

irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported."

That the service is performed wholly in one State can make no difference if it is a part of interstate carriage. "The transportation of live stock," said this court in *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, 136, in treating of the duties of common carriers, irrespective of the Act to Regulate Commerce, "begins with their delivery to the carrier to be loaded upon its cars, and ends only after the stock is unloaded and delivered, or offered to be delivered, to the consignee." In this connection see *Coe* v. *Errol,* 116 U. S. 517; *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498.

The fact that the performance of the service is distributed among different corporations having common ownership in a holding company which controls an interstate system was held in *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission, supra,* to make no difference, where the service to be performed was a part of the carriage of freight by railroad in interstate commerce. Nor does it make any difference that neither the Junction Company nor the Stock Yard Company issues through bills of lading. It is the character of the service rendered, not the manner in which goods are billed, which determines the interstate character of the service. *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission, supra; Ohio R. R. Comm.* v. *Worthington,* 225 U. S. 101.

Together, these companies, as to freight which is being carried in interstate commerce, engage in transportation within the meaning of the act and perform services as a railroad when they take the freight delivered at the stock yards, load it upon cars and transport it for a substantial distance upon its journey in interstate commerce, under

a through rate and bill furnished by the trunk line carrier, or receive it while it is still in progress in interstate commerce upon a through rate which includes the terminal services rendered by the two companies, and complete its delivery to the consignee. They are common carriers because they are made such by the terms of their charters, hold themselves out as such and constantly act in that capacity, and because they are so treated by the great railroad systems which use them. In *Union Stock Yards Co.* v. *United States,* 169 Fed. Rep. 404, Mr. Justice Van Devanter (while a Circuit Judge), speaking for the Court of Appeals, said (406):

"Its [the Stock Yards Company's] operations . . . include the maintenance and use of railroad tracks and locomotives, the employment of a corps of operatives in that connection, and the carriage for hire over its tracks of all live stock destined to or from the sheds or pens, which, in effect, are the depot of the railroad companies for the delivery and receipt of shipments of live stock at South Omaha. The carriage of these shipments from the transfer track to the sheds or pens and vice versa is no less a part of their transit between their points of origin and destination than is their carriage over any other portion of the route. True, there is a temporary stoppage of the loaded cars at the transfer track, but that is merely incidental, and does not break the continuity of the transit any more than does the usual transfer of such cars from one carrier to another at a connecting point. And it is of little significance that the stock-yards company does not hold itself out as ready or willing generally to carry live stock for the public, for all the railroad companies at South Omaha do so hold themselves out, and it stands ready and willing to conduct, and actually does conduct, for hire a part of the transportation of every live stock shipment which they accept for carriage to or from that point, including such shipments as are interstate."

We think that these companies, because of the character of the service rendered by them, their joint operation and division of profits and their common ownership by a holding company, are to be deemed a railroad within the terms of the act of Congress to regulate commerce, and the services which they perform are included in the definition of transportation as defined in that act. It is the manifest purpose of the act to include interstate railroad carriers, and by its terms the act excludes transportation wholly within a State. In view of this purpose and so construing the act as to give it force and effect, we think the Stock Yard Company did not exempt itself from the operation of the law by leasing its railroad and equipment to the Junction Company, for it still receives two-thirds of the profits of that company and both companies are under a common stock ownership with its consequent control. We therefore think the Commerce Court was right in holding that the Junction Company should file its rates with the Interstate Commerce Commission and that it should also have held the Stock Yard Company subject to the provisions of the Interstate Commerce Acts.

As to the Pfælzer contract, both parties concede the authority of the Commerce Court to pass upon this subject and no objection was made as to the manner and form in which the jurisdiction of that court was invoked. There being no objection taken to the method of proceeding, we think, if this contract is within the prohibitions of the act, that the Commerce Court had the right to entertain the bill and to enjoin the performance of the contract. Sections 2 and 3 of the Elkins Act. It is contended that this contract is violative of certain features of the Act to Regulate Commerce and of the Elkins Act. Section 2 of the former and § 1 of the latter provide:

"SEC. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge,

demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

"Sec. 1 . . . It shall be unlawful for any person, persons, or corporation to offer, grant, or give or to solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said Act to regulate commerce and the Acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said Act to regulate commerce and the Acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. . . ."

This court has had frequent occasion to comment upon the purpose of Congress in the passage of these laws to require equal treatment of all shippers and to prohibit unjust discrimination in favor of any of them. *New York, New Haven & Hartford R. R. Co. v. Interstate Commerce Commission*, 200 U. S. 361; *Armour Packing Co. v. United States*, 209 U. S. 56; *Louisville & Nashville R. R. v. Mottley*, 219 U. S. 467; *Chicago & Alton R. R. Co. v. Kirby*, 225 U. S. 155.

By § 2 of the Act to Regulate Commerce the carrier is guilty of unjust discrimination, which is prohibited and declared unlawful, if by any rebate or other device it charges one person less for any service rendered in the

transportation of property than it does another for a like service. The Elkins Act makes it an offense for any person or corporation to give or receive any rebate, concession or discrimination in respect to the transportation of property in interstate commerce whereby any such property shall be transported at a rate less than that named in the published tariff or whereby any other advantage is given or discrimination is practiced. By the very terms of the contract it is evident that the interest of the Stock Yard Company and also of the Junction Company is in the profit to be made in receiving and delivering, handling and caring for and transporting live stock, shipments of which, to the extent stated, are made in interstate commerce. The contract provides that if the Pfælzers construct a packing plant adjacent to the stock yards of the Stock Yard Company they shall receive $50,000, and it obligates them to maintain and operate the plant for a period of fifteen years and buy and use in their slaughtering business such live stock only as moves through such stock yards, and if not so bought to pay the regular charges thereon as if the same had moved into the stock yards and had been there purchased by them. In other words, this plant in effect may pay for the services of the Stock Yard Company, up to the sum of $50,000, with the bonus given to the Pfælzers for the location of their plant in juxtaposition to the stock yards. The only interest which the Stock Yard Company has in Pfælzer & Sons' interstate business is compensation for its services in handling their freight and its share of the profits realized by the Junction Company in rendering its service. Any other company with which it has made no contract would be compelled to pay the full charge for the services rendered without any rebate or concession. Another company might have a contract for a larger or smaller bonus, and thereby receive different treatment. Certainly as to the company which receives no such bonus there has

been an undue advantage given to and an unlawful discrimination practiced in favor of Pfælzer & Sons. If these companies had filed their tariffs, as we now hold they should have filed them, they would have been subject to the restrictions of the Elkins Act as to departures from published rates—and we must consider the case in that light—and this preferential treatment, as we have said, would have been in violation of that act. It is the object of the Interstate Commerce Law and the Elkins Act to prevent favoritism by any means or device whatsoever and to prohibit practices which run counter to the purpose of the act to place all shippers upon equal terms. We think the Commerce Court should have enjoined the carrying out of this contract.

> It follows that in case No. 621 the judgment of the Commerce Court should be reversed and the case remanded for the entry of a decree in conformity to this opinion. In No. 622 the judgment of the Commerce Court should be affirmed.