ATTLEBORO STEAM & ELECTRIC COMPANY *vs.* PUBLIC UTILITIES COMMISSION *et al.*

JUNE 18, 1925.

PRESENT: Stearns, Rathbun, Sweeney, and Barrows, JJ.

STEARNS, J. These are two proceedings, one by *certiorari*, the other by appeal from an order of the Public Utilities Commission, brought by the Attleboro Steam & Electric Company (hereinafter Attleboro Co.). Appellant, being in doubt as to the correct procedure, brought the two proceedings; the same question is raised in each.

The Attleboro Co. seeks to have Order No. 876 made by the Public Utilities Commission (hereinafter the Commission) reversed and declared invalid.

The facts, so far as essential to the present inquiry, are as follows. The Attleboro Co. supplies electricity for public and private use in Attleboro, Mass. The respondent, Narragansett Electric Lighting Co. (hereinafter Narragansett Co.) a Rhode Island corporation, is engaged in a general electric lighting, heating and power business.

May 8, 1917, a contract was made by Narragansett Co., party of the first part, with two Massachusetts corporations, Attleboro Co., party of the second part, and Seekonk Electric Company (hereinafter Seekonk Co.) party of the third part. The Narragansett Co. agreed to sell to the Attleboro Co. for a period of twenty years all the electrical energy used by the Attleboro Co. and supplied to its customers in the city of Attleboro; such electrical energy was to be delivered at the State line between Seekonk, Mass. and East Providence, R. I., and to be metered on the transformers of the Attleboro Co. at its generating plant in Attleboro; the Seekonk Co. agreed to secure the necessary rights of way through Seekonk and build therein a transmission line from the point of delivery at the State line to the boundary line between Seekonk and Attleboro and there connect with the transmission line to be built by the Attleboro Co. to connect with its station in Attleboro. The Narragansett Co. agreed to build the transmission line for the Seekonk Co., the latter to pay therefor, however, only the actual cost of material and labor and such other costs as would be considered assets to capitalize by the Massachusetts Board of Gas and Electric Light Commissioners, the cost to the Seekonk Co. in no event to exceed $4,500 a mile. A similar provision for construction was made with the Attleboro Co. for its transmission line. The Narragansett Co. agreed to pay annually to each of the companies 15% of the amounts paid by each to the Narragansett Co. for such construction, and in addition to pay the Seekonk Co. annually 15% of any additional expenditures for additions or changes in its lines. The Attleboro Co. agreed to furnish the necessary transformers, &c., at its station to re-

ceive the electric current, and the Narragansett Co. agreed to pay the Attleboro Co. $1,750 annually for the operation by the Attleboro Co. of the receiving station. The Narragansett Co. agreed to install and maintain as its property and at its expense, meters on the transformers at the station of the Attleboro Co. to measure and determine the amount of current received and to be paid for by said company. The contract price, 8.57 mills per kilowatt hour as registered by such meters, was to be subject to increase or decrease at the rate of .085 mills per kilowatt hour for every ten cent variation from the base price of $3.50 per long ton of coal delivered alongside the generating station of the Narragansett Co. on the Providence River. The contract provides for a decrease of price if the electrical energy is produced by cheaper fuel or the cost is less by reason of the use of any subsequent invention or improvement. Any change of federal, state, or municipal laws or regulations, changing any existing taxes or imposts which materially increases or decreases the cost to the Narragansett Co. of generating, or delivering electrical energy, was to be equitably adjusted in the price by the parties.

The Attleboro Co. agreed to retain and maintain its present generating station and machinery except its present engine driven units, and that the Narragansett Co. at any time at its own expense might use the same for generating and supplying electrical energy to the Attleboro Co.

The Narragansett Co. guaranteed to the Attleboro Co. that the Seekonk Co. would promptly and properly perform its contract obligations and to indemnify the Attleboro Co. for any loss suffered by it because of any breach of the contract by the Seekonk Co.

May 14, 1917, the Narragansett Co. filed with the Commission schedule No. 68, setting out the rate and general terms of the contract, and an application that said rate be approved as a special rate under Sec. 42, Public Utilities Act (C. 795, P. L. 1912). May 23, 1917, the Commission made an order authorizing the Narragansett Co. to grant

a special resale rate to the Attleboro Co. at the State line in accordance with schedule No. 68. The parties proceeded to carry out the contract and the Narragansett Co. is still supplying electrical energy to the Attleboro Co. May 7, 1924, the Narragansett Co. filed with the Commission schedule No. 125, setting out a rate for service to the Attleboro Co. materially higher than the rate specified in the contract and schedule No. 68. At the solicitation of the Narragansett Co. the Commission, on its own motion, ordered an investigation and public hearing upon the propriety of the proposed change of rate and directed that notice thereof be given by mail to the two companies. The Attleboro Co. appeared at the hearing and made objection to the jurisdiction of the Commission. This objection was overruled and a hearing was had on the merits of the proposed change. January 21, 1925, the Commission made an order, No. 876, to the effect that the contract rates were insufficient, unjustly discriminatory and in violation of the Public Utilities Act; that the increased rates in schedule No. 125 were just and reasonable and ordered that they should become effective February 1, 1925. The Attleboro Co. challenges this order and claims it is unlawful and void on various grounds; the principal and decisive objection, in our judgment, is that said order is an improper interference by the State with interstate commerce.

The Attleboro Co. is properly here by appeal. Sec. 34, C. 795, provides that any public utility or any complainant aggrieved by any order of the Commission fixing any rate, etc., may appeal to the Supreme Court for a reversal of such order. The Attleboro Co. is not a "public utility" as that term is used in the act (Sec. 2) nor is it strictly a "complainant" in a technical sense, as the original proceeding was begun by the Commission on its own motion (Sec. 26). The Commission by Sec. 28 is required to give notice to such interested parties as the Commission shall deem necessary, as provided in Sec. 20. This latter section requires the Commission to give to "the public utility and the com-

plainant, if any," ten days' notice of the time and place of the hearing. Sec. 28 provides that after notice is given, proceedings shall be conducted in like manner as though complaint had been filed with the Commission relative to the matter investigated. Sec. 56 provides that the provisions of the act shall be interpreted and construed liberally in order to accomplish the purposes thereof. One evident purpose of the statute is to subject any order of the Commission whereby any one is legally aggrieved, to review by the Supreme Court. The Attleboro Co. after appearing at the hearing in response to the notice and thereafter taking part in the proceedings, thereby became a complainant within the meaning of the statute and was vested with all the rights of a complainant including, of course, the right of appeal. See *P. U. Com.* v. *Prov. Gas Co.*, 42 R. I. 1.

The sale and transportation of electricity generated in one state, and conveyed directly to a purchaser in another state is interstate commerce. It is the essential nature of the service rendered which determines whether commerce is interstate or intrastate; if the actual movement is interstate, it is immaterial that the place of delivery or the place at which title passes, is at the State line. The transportation of the electricity is continuous from this State to its ultimate destination in another state and consequently is interstate commerce. *U. S.* v. *Union Stock Yard*, 226 U. S. 286; *Penna. R. R.* v. *Clark Coal Co.*, 238 U. S. 456; *Texas & New Orleans R. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111; *United Fuel Gas Co.* v. *Hallanan*, 257 U. S. 277.

In the recent case (decided May 26, 1924), *Missouri* v. *Kansas Gas Co.*, 265 U. S. 298, Associate Justice SUTHERLAND, speaking for the court, says the line of division between cases, where, in the absence of congressional action, the State is authorized to act, and those where state action is precluded by mere force of the commerce clause of the Constitution, is not always clearly marked; in the absence of congressional legislation, a State may constitutionally impose taxes and enact laws of internal police generally

although they may have an incidental effect upon interstate commerce, but the commerce clause of the Constitution, of its own force, restrains the States from imposing direct burdens upon interstate commerce. The court then quotes with approval the following statement of the law in the *Minnesota Rate Cases*, 230 U. S. 352, 396: "If a state enactment imposes a *direct burden* upon interstate commerce, it must fall regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free."

The *Kansas Natural Gas Co.* was engaged in producing and buying natural gas and transporting, selling and delivering it from Kansas to Missouri in large quantities to independent distributing companies, which then sold and delivered it to local consumers in numerous communities in Kansas and Missouri. The pipe lines were continuous from the wells to place of delivery. The Gas Co. raised its rates in Missouri without the consent and approval of the Public Utilities Commission of that state and in Kansas, notwithstanding a previous order of the Federal Court fixing a lower rate and the action and approval of the Public Utilities Commission approving and fixing such lower rate. Three cases were consolidated for argument in the Supreme Court: No. 155 was a suit in the Federal Court to enjoin the Kansas Gas Co. from increasing its rates in Missouri without the consent of the Public Utilities Commission of that state. An injunction was denied in the lower court. This decision was affirmed. In No. 133 the Kansas Supreme Court issued a mandamus to compel the Gas Co. to re-establish and maintain certain rates in Kansas until otherwise ordered by Public Utilities Commission. This decision was reversed. No 137 was a suit in a Federal Court in Kansas to enjoin the collection by the Gas Co. of increased rates in Kansas until allowed by the Kansas Utilities Commission. An injunction was denied in the lower court. The decision was affirmed.

The Supreme Court held that the sale, transportation and delivery were an inseparable part of a transaction fundamentally interstate from beginning to end—not local but essentially national in character—and that enforcement of a selling price in such a transaction placed a direct burden upon such commerce inconsistent with that freedom of interstate trade which it was the purpose of the commerce clause to secure and preserve. The court said, (p. 308): "It is as though the Commission stood at the state line and imposed its regulation upon the final step in the process at the moment the interstate commodity entered the State and before it had become part of the general mass of property therein."

The attempt of a state to fix the rate was held to be invalid because it imposed a direct burden on interstate commerce; and that this could not be done even though there was an absence of any regulation by congress.

The Narragansett Co. seeks to distinguish the *Kansas Gas Co.* case from the case at bar. It is urged that as it does an extensive local business in this state, if it loses money on its service to appellant it will be compelled to charge the local public higher rates than would otherwise be reasonable; that one of the principal purposes of the Public Utilities Act is to ensure service at reasonable rates to all customers, and, to enable the Commission to effectually carry out this purpose, it is necessary and proper that the State should be permitted to regulate the service to the appellant; that in the *Kansas* case the business of the Gas Co. (with an exception not specified) was a wholesale and wholly interstate; as the principal business of the Narragansett Co. is local, the purpose of the attempted State regulation is not to regulate interstate commerce but to regulate local service, and that any regulation of interstate commerce is only incidental and indirect, is necessary to properly protect local service and should not be held to invalidate the State regulation. The Narragansett Co., to some extent, relies on the authority of *Penna. Gas Co.* v.

*Public Service Comm.* 252 U. S. 23 (decided in 1920). In that case the Natural Gas Co., a Pennsylvania corporation, transported natural gas from the source of supply in Pennsylvania through its pipe line to certain municipalities in the State of New York and there sold the gas directly to numerous local consumers. This was held to be interstate commerce. The service in New York was held to be a local service similar to that furnished by any local gas company and not of the character which requires general and uniform regulation of rates by congressional action; that, although the local rates might affect the interstate business of the company, this fact did not prevent the State of New York through its Utilities Commission from making local regulations of rates of a reasonable character.

The Pennsylvania case was distinguished and limited in its application by the court in the later *Kansas Gas Co.* case, *supra.* The case at bar we think is like the *Kansas* case. Applying the principles confirmed therein, we think that the action of the State commission imposes a direct burden on interstate commerce and consequently is invalid. The intrastate and interstate business of the Narragansett Co. can be segregated. This separation has actually been made by that company and the Commission, in establishing a basis for the proposed new rate. The effect of the action of the Commission was direct on interstate commerce and incidental on local and State commerce. Such being the case there is no difference in principle because of the amount of interstate commerce involved, whether it is much or little, at wholesale or retail. The purpose of the state action is immaterial, if the result is to impose a direct burden on interstate commerce..

The writ of *certiorari* is dismissed as the Attleboro Co. has a statutory remedy by appeal.

The appeal is sustained, the order of the Commission establishing a new rate as per schedule No. 125 is reversed.

The motion of the Narragansett Co. that the appeal shall not act as a stay (C. 795, s. 35—now G. L. 1923, C. 253, s. 35) of the order appealed from is denied.

*Curtis, Matteson, Boss & Letts, Archibald C. Matteson, Storey, Thorndike, Palmer & Dodge, R. G. Dodge, H. S. Davis,* for Attleboro Steam & Electric Co.

*Hinckley, Allen, Tillinghast & Phillips, Arthur M. Allen, Roger T. Clapp, Ropes, Gray, Boyden & Perkins, Roland W. Boyden, Frank 'D. Comerford,* for Narragansett Electric Lighting Co.

*Charles P. Sisson, Attorney General,* for the Public Utilities Commission.