## SWIFT & CO. et al. v. UNITED STATES et al.

### Civil Action No. 2188.

District Court, N. D. Illinois, E. D.

June 4, 1941.

Edgar B. Kixmiller and Ross Dean Rynder, both of Chicago, Ill., for plaintiffs.

E. M. Reidy and D. H. Kunkel, both of Washington, D.C., for Interstate Commerce Commission.

Smith R. Brittingham, Jr., and Thurman Arnold, both of Washington, D.C. (Daniel W. Knowlton, Chief Counsel, of Washington, D.C., and J. Albert Woll, U. S. Atty., of Chicago, Ill., of counsel), for the United States.

Before SPARKS, Circuit Judge, and SULLIVAN and IGOE, District Judges.

PER CURIAM.

Pursuant to the rules of civil procedure, 28 U.S.C.A. following section 723c, the court makes the following findings of fact and states the following conclusions of law upon the entire record in the above-entitled action:

Findings of Fact

1. By complaint filed with the Interstate Commerce Commission on September 20, 1937, against the Alton Railroad Company and other common carriers by railroad, Swift & Company, G. H. Hammond Company and Omaha Packing Company, wholly owned subsidiaries of Swift & Company, alleged that the railroads defendants' failure to afford the right of egress for livestock from unloading pens at the Union Stock Yards in Chicago, owned and operated by the Union Stock Yards & Transit Company at Chicago, to the nearest public street, in connection with direct shipments of livestock consigned to complainants, free from any charge other than the line-haul rate,

had resulted and results in an unreasonable practice in violation of the Interstate Commerce Act.

2. Complainants Swift & Company and Omaha Packing Company are engaged in the packing house business and operate packing plants for the processing of livestock at Chicago, Ill., which plants are located adjacent to the Union Stock Yards in Chicago.

3. The complaint was docketed by the Interstate Commerce Commission as No. 27862, Swift & Company et al. v. Alton Railroad Company et al., the defendants being common carriers by railroad engaged in the transportation of livestock to Chicago. The Union Stock Yard & Transit Company was not named as a defendant.

4. In the complaint heretofore referred to, the Commission was asked to require the railroads defendants to cease and desist from the alleged unlawful practice, and to establish and maintain reasonable means of egress from the unloading pens at the Union Stock Yards to the public streets free from the payment of any charges other than the line-haul rate. The Commission was also asked to award reparation to each complainant for the charges paid by reason of the unlawful practice during the period of two years preceding the filing of the complaint and during the pendency of the proceeding.

5. Answers to the complaint were filed by the railroads defendants; Armour and Company was permitted to intervene in support of the complaint, full hearings were held before an examiner of the Commission, briefs were filed, and examiner's proposed report was issued, to which complainants filed exceptions, which exceptions were replied to by defendants, and the proceeding was orally argued before the entire Commission.

6. On April 8, 1940, the Commission issued its report, 238 I.C.C. 179, annexed to and made a part of the bill of complaint as Exhibit B, in which the Commission, among other things, found:

"We find that the transportation of direct shipments of livestock consigned to complainant at the Union Stock Yards in Chicago, Ill., ends when the livestock has been unloaded into the unloading pens at the Union Stock Yards. We further find that the yardage charges assessed by the Union Stock Yard and Transit Company of Chicago on direct shipments of livestock, as defined in the report, transported to the Union

Stock Yards, for services performed and facilities used beyond the gates leading from the pens in the stockyards into which the livestock is unloaded from railroad cars, are not subject to our jurisdiction.

"We further find that defendants' failure to afford egress for shipments of livestock described in the preceding paragraph free from the payment of yardage charges has not resulted and does not result in an unreasonable practice."

7. The Commission further found that after the livestock arrives at the Union Stock Yards, it proceeds to unloading platforms on the property of and owned by the Yard Company where the car door is opened by employees of the Yard Company and the livestock driven by its employees through chutes into unloading pens adjacent to the unloading platforms. As to the shipments for Swift & Company, if its employees are at the unloading platforms when the animals are placed therein, they are driven by Swift's employees from the unloading pens through the property of the Yard Company to the plant of Swift & Company located outside the stock yards. If Swift's employees are not at the unloading pens, and the volume of livestock necessitates immediate removal of the animals, they are taken from the unloading pens to holding pens by employees of the Yard Company; later they are driven from the holding pens through the Yard Company's property to Swift's plant by Swift's employees. Whether possession is taken at the unloading pens or at the holding pens, Swift is required to pay a yardage charge to the Yard Company on each animal, under authority of a tariff on file with the Secretary of Agriculture.

8. The Commission's report states that it is physically impossible to remove livestock from the unloading pens in the stock yards to complainant's plant or to public streets except by use of the Yard Company's property. It is shown that these yardage charges are assessed and collected by the Yard Company on every animal unloaded from railroad cars at the stockyards, which is the largest livestock market in the United States and the only public market for the sale of livestock in the City of Chicago. These charges, so the Commission found, are compensation for services performed by and the use of facilities of the Yard Company after the stock is placed in unloading pens. For the efficient and orderly handling of the large number of shipments arriving at the stock yards, employees of the Yard Company are the only ones permitted to handle the livestock when it reaches the unloading platforms.

9. The Commission further found that for more than seventy years, or during its entire existence, the Union Stock Yards Company has assessed and collected from the shipper a yardage charge on every animal unloaded on its premises. Most of plaintiff's shipments are now being made to the plant of its subsidiary, the Omaha Packing Company, located about two miles from the Union Stock Yards, and the stock received at the plant of the Omaha Packing Company is transported by motor truck over the streets of Chicago to the Swift plant without the payment of the yardage charge.

10. The Commission further found that for more than seventy years it has been the practice of the Union Stock Yards Company to collect a yardage charge on every animal unloaded from the car at Union Stock Yards, and this practice was accepted as a reasonable practice by the interested parties until 1933, when complainant made its first protest against the practice.

11. The Commission's report also states: "During a substantial portion of the period referred to, complainant not only paid the yardage charge without protest, but, in association with other packers, demanded and received participation with the Yard Company in the profits of the latter company."

12. The report also finds that because of the physical conditions existing in the Union Stock Yards, the railroads could not provide egress from the unloading pens to a public street without use of the property of the Yard Company.

13. The Commission in its report, after reviewing the evidence, found: "The evidence shows that for more than 70 years, under the usage and practice at the Union Stock Yards, the responsibility of the railroads in respect of direct shipments of livestock consigned to said yards has ended with the unloading service, and that by affirmative action, beginning about 1890 and continuing for many years, the packers, including complainant and intervener, insisted that the performance of the yardage service upon their shipments was a private matter between themselves and the Yard Company, unaffected by the tariffs covering the transportation charges of the railroads. * * *"

14. The Commission's report points out that the line-haul carriers have never performed services on direct shipments of live-

stock transported to the Union Stock Yards after it is unloaded, and they have no voice in the nature of the yard services provided or in the manner in which they are performed; they have never been compensated for any services performed at the stockyards after the placement of the animals in the unloading pens. The rates applicable on livestock transported to the stockyards do not include any allowance to cover yardage services.

15. The Commission also found that under the railroad tariffs, the shippers of livestock have the choice of consigning their shipments to the Union Stock Yards, and having them unloaded there without extra charge, or taking delivery on team tracks at other points in the Chicago district, in which event they unload the cars themselves; "that direct shipments of livestock are unloaded at the Union Stock Yards only when complainant elects to take delivery there."

16. After reviewing the evidence of record, including the long-standing practices and customs in the industry, the Commission found and held that Section 15(5) of the Interstate Commerce Act, 49 U.S. C.A. § 15(5), could not be construed as imposing an obligation upon defendants to compensate the public stockyards for the use of the facilities necessarily involved in removing the direct shipments from the suitable unloading pens to the boundary of the Yard Company's property.

17. The Commission further found that for almost 50 years prior to the decision of the Supreme Court in 1912, United States v. Union Stock Yard & Transit Co., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226, holding the Yard Company to be a common carrier, the company had maintained two charges, one for unloading the livestock and a yardage charge imposed upon all animals in addition to the unloading charge. Also that no tariff of the Yard Company on file with the Commission ever included yardage charges.

18. The Commission found that the obligation of the carriers in transporting ordinary livestock in carload lots to public stock yards is to make delivery into pens on the stock yards' property which are suitable to receive the stock in a safe manner; that there is a distinction between transportation to public stock yards generally and transportation to other than public stock yards; and that the carriers' duty with respect to livestock consigned to the Chicago Union Stock Yards ended upon delivery in-

to suitable pens and did not include the removal of the livestock from such pens to a point outside the Stock Yards.

Following this finding the Commission's report states: "The above interpretation is the interpretation placed upon the amendment since its enactment by the actions of the packers, including complainant and intervener, of the producers, of the Yard Company, and of the railroads. For more than 50 years prior to the enactment of section 15(5) and since its enactment [49 U.S. C.A. § 15(5)], usage and physical conditions combined to end transportation on direct shipments of livestock at the unloading pens. The packers, including complainant and intervener, not only acquiesced in the usage and practice but, in addition, by their agreements with the Yard Company and their participation in the earnings of that company received from its yardage charges, by their guarantee for a limited period of earnings to the Yard Company, and by other acts hereinbefore described, have concurred in the practice and have made it their own."

19. On the same date as that on which its report was issued, namely, April 8, 1940, the Commission issued an order dismissing the complaint, whereupon a petition for reargument and reconsideration was filed by complainants, replied to by railroads defendants, and denied by the Commission on July 8, 1940. This suit was instituted upon complaint filed October 7, 1940, by Swift & Company and Omaha Packing Company, organized and existing under and pursuant to the laws of the States of Illinois and Kentucky, whose principal offices and places of business are in Chicago. The matter covered by the aforesaid order of the Commission, now sought to be set aside, was entered upon the petition of complainants, residents of the Northern District of Illinois, Eastern Division, within the meaning of 28 U.S.C.A. § 43, and this court has jurisdiction.

20. Defendant, United States of America, is sued herein pursuant to 28 U.S.C.A. §§ 43 to 48.

21. The defendant, Interstate Commerce Commission, is an administrative commission existing under and by virtue of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and is specifically charged with the administration and enforcement of the provisions of said act.

22. The Alton Railroad Company and other common carriers by railroad serving the Union Stock Yards intervened as parties

**1000**

defendant, and filed answers to the bill of complaint.

23. Complainants herein prayed, among others things, that upon final hearing this court adjudge, order and decree that said order of the Commission of April 8, 1940, is, and at all times has been, beyond the lawful authority of the Commission, is null and void, and should be perpetually set aside and annulled.

24. The United States of America and the Interstate Commerce Commission filed their respective answers to the complaint. Said answers, in substance, admitted the making of the report and order of the Commission complained of; denied that said order was made without adequate findings and evidence to support it; denied that said order was in any other respect unlawful, and by amended answer alleged that the court had no authority, in so far as reparation was sought, to grant the relief prayed. The answers of these defendants, as well as the answer of intervening railroads defendants, alleged that said order of April 8, 1940, was made after full hearing and consideration of all the evidence before the Commission and of all the arguments advanced by the parties, and that it was supported by adequate findings and substantial evidence.

25. On April 21, 1941, the cause came on for final hearing upon the merits before this court, specially constituted of three judges, as required by the Urgent Deficiencies Act of October 22, 1913, 28 U.S.C.A. § 47. On such hearing there was before the court, and the court considered, the entire record of the evidence before the Commission, including the transcript of testimony taken before the Commission and the exhibits introduced in evidence before the Commission.

### Conclusions of Law

1. The findings made by the Commission are adequate to support its conclusion that the transportation of direct shipments of livestock to the Union Stock Yards at Chicago is completed when the livestock is placed in the unloading pens, and that yardage charges assessed by the Stock Yards Company for services performed, and facilities used beyond the gates leading from the pens in the stockyards, into which the livestock is unloaded from railroad cars, is not subject to the jurisdiction of the Commission, and that the failure of the railroad defendants to afford egress for direct shipments of livestock transported to the Union Stock Yards did not result in an unreasonable practice.

2. The Commission had evidence before it sufficient to sustain its findings.

3. The order of the Commission dated April 8, 1940, was within the lawful authority of the Commission, was not arbitrary or capricious and does not deprive plaintiffs of their property without due process of law.

4. Plaintiffs are not entitled to the setting aside or annulling of said order of April 8, 1940, or to a permanent injunction against its enforcement, or to any relief.

A decree dismissing the complaint is entered herein.