UNITED STATES v. UNION PAC. R. CO.

(Circuit Court of Appeals, Eighth Circuit. March 27, 1914.)

No. 3999.

1. CARRIERS (§ 37*) — CARRIAGE OF LIVE STOCK — STATUTORY PENALTY — LIABILITY.

At the junction point of three railroads, all of whom were under a common control, there was a terminal company, which was a separate corporation, part of whose officers were officers of the railroad companies, but which had employés and equipment and which transferred the cars or trains from one railroad to the other. The terminal company had filed certain schedules of rates with the Interstate Commerce Commission, but it made no charges against the three carriers for the transfer of the cars from one to the other or to the stockyards, and did not hold itself out to the public as a connecting carrier. The defendant carrier accepted a car load of horses to be transported on the line of one of the other carriers connecting with it at the junction point. The horses reached the junction shortly prior to the expiration of the time for unloading as required by the Twenty-Eight Hour Law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1911, p. 1341]), and were placed on a side track. The terminal company removed them to the stockyard for unloading three hours after the time had expired. *Held*, that while the initial carrier might employ the terminal company to do the work of transferring the car to the connecting carrier for it, it was liable, both to the shipper and to the government for the penalty imposed by the Twenty-Eight Hour Law, for the acts of such employé until the car was delivered to the connecting carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*

Liability of carrier for failure to feed, water, and rest live stock and for violation of Twenty-Eight Hour Law, see note to St. Joseph Stockyards Co. v. United States, 110 C. C. A. 435.]

2. CARRIERS (§ 37*)—CARRIAGE OF LIVE STOCK—LIABILITY OF INITIAL CARRIER.

The duty of a connecting carrier of live stock is not discharged until it has been imposed upon the carrier next in order.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date; & Rep'r Indexes

3. CARRIERS (§ 37*)—CARRIAGE OF LIVE STOCK—LIABILITY—ACTS OF SUBORDI-
    NATE AGENT.

    A carrier of live stock may employ a subordinate agency to perform a
    service undertaken by it, but the agency must be subordinate to the car-
    rier, and not to one who neither employs it, pays it, nor has any right to
    interfere with it.

    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec.
    Dig. § 37.*]

In Error to the District Court of the United States for the District
of Utah; John A. Marshall, Judge.

Action by the United States of America against the Union Pacific
Railroad Company. Judgment for the defendant, and the United
States brings error. Reversed and remanded for new trial.

Hiram E. Booth, U. S. Atty. of Salt Lake City, Utah (William M.
McCrea, Asst. U. S. Atty., of Salt Lake City, Utah, on the brief). ·

George H. Smith, of Salt Lake City, Utah (P. L. Williams, of Salt
Lake City, Utah, N. H. Loomis, of Omaha, Neb., and John V. Lyle, of
Salt Lake City, Utah, on the brief), for defendant in error.

Before HOOK and CARLAND, Circuit Judges, and VAN VAL-
KENBURGH, District Judge.

HOOK, Circuit Judge. · This was an action by the government to
recover a penalty from the Union Pacific Railroad Company for vio-
lating Act of June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. St.
Supp. 1911, p. 1341), commonly called the Twenty-Eight Hour Law.
A car load of horses was shipped from Denver, Colo., to Salt Lake
City, Utah. The owner of the horses who went with them consented
in writing, as authorized by the statute, that the period of confinement
without unloading for rest, water, and feeding should be extended to
36 hours. The route was over the Union Pacific and Oregon Short Line
railroads, Ogden, Utah, being the junction point. When the Union
Pacific train containing the car in question reached the yards at Og-
den it went from the main line of that road onto a siding and the train-
men left it there. Thirty-five hours and twenty minutes had then
elapsed since the horses were last unloaded. A switching crew took
the car and delivered it at the stockyards about a mile distant 3 hours
and 40 minutes later. The horses had then been confined 39 hours.
The defense was that when the train went from the main line to the
siding the car was no longer under defendant's jurisdiction, but was in
the custody of the Ogden Union Railway & Depot Company, an inde-
pendent corporation, for whose acts or neglect it was not responsible,
and that the lawful period of confinement had not expired when it
gave up possession. The trial court directed a verdict for defendant.

[1-3] Though the terminal company was incorporated ·and had its
own engines and employés, the evidence showed that in the handling
of the car of horses it did not act as an independent carrier, but was
a mere agency or instrumentality which defendant used to perform its
transportation duties. The Union Pacific Railroad entered Ogden
from the east and ended there, the Southern Pacific (Central Pacific)
ran thence to the coast, and the Oregon Short Line went through the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

city in a northerly and southerly direction. These three systems of railroad were then operated as one under a common management, and the terminal company at Ogden served them exclusively. Tracks belonging to them were embraced in the terminals, and the company was officered, in part at least, by their officials. A tariff was filed by the terminal company with the Interstate Commerce Commission, but it related only to certain switching charges on traffic originating or destined there, and did not embrace ordinary transportation rates, or charges for the transfer of trains or cars from one of the railroads to the other, or charges for the transfer of cars of stock from one of the railroads to the stockyards for unloading according to the statute, when destined beyond as in this case. It performed all such work without charge of any kind, except that the terminal expenses and costs of operation were apportioned between and paid by the interested railroad companies on the basis of the number of cars handled, of which an account was kept. In respect of these matters the terminal company was a clearing house for the adjustment between them of the expense of operating the common facilities. The car of horses was shipped over the Union Pacific and Oregon Short Line connecting at Ogden. The terminal company did not hold itself out to the public as a connecting carrier, and the shipper did not know it as such. It was the duty of the Union Pacific to deliver the car to the Oregon Short Line, and until it did so it remained responsible for the horses and for compliance with the statute regulating their confinement. According to general principles of law the duty of a connecting carrier is not discharged until it has been imposed upon the carrier next in order. Condon v. Railroad, 55 Mich. 218, 21 N. W. 321, 54 Am. Rep. 367; Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 621, 626, 22 Sup. Ct. 253, 46 L. Ed. 358. Also, when a carrier has undertaken a service, it "may employ a subordinate agency; but it must be subordinate to him, and not to one who neither employs it nor pays it, nor has any right to interfere with it." Bank of Kentucky v. Adams Express Co., 93 U. S. 174, 182, 23 L. Ed. 872. See Covington Stockyards Co. v. Keith, 139 U. S. 128, 136, 11 Sup. Ct. 461, 35 L. Ed. 73.

True, these principles are applied as between carrier and shipper, but by analogy they apply also to duties imposed by public statute to prevent cruelty to stock in transportation. The limit of 36 hours was near expiration when the car reached Ogden. Thirty-nine hours had elapsed when it reached the stockyards for unloading. It had not been delivered to the Oregon Short Line, the connecting carrier, but in the meanwhile was in the custody of a local instrumentality which defendant selected and used to discharge its duties both to the shipper and under the statute and for whose conduct it was responsible. The terminal company was an employé of the defendant, incorporated, it is true, but as much so as if its individual servants had done the work.

The judgment is reversed, and the cause remanded for a new trial.