BROOKLYN EASTERN DIST. TERMINAL v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.    January 9, 1917.)

No. 97.

1. MASTER AND SERVANT ⊚⇒13—HOURS OF SERVICE ACT—"TRAIN."

The members of a switching crew employed by a terminal company engaged in interstate transportation, whose only duties were to move drags of one or more cars to or from car floats and about the terminal yards, are persons actually engaged in or connected with the movement of a train, within Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913; §§ 8677–8680), though switching operations have been held not train movements under Safety Appliance Act March 2, 1893, c.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

196, 27 Stat. 531 (Comp. St. 1913, §§ 8605–8612), since a string of connected cars hauled on one track by one or more engines is in common speech a "train," and such employés are within the purpose of the Hours of Service Act to promote reliability and health of the employés.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. 13.

For other definitions, see Words and Phrases, First and Second Series, Train.]

2. MASTER AND SERVANT 13—HOURS OF SERVICE ACT—"COMMON CARRIER"— TERMINAL COMPANY.

A terminal company, receiving and delivering goods only from or to common carriers by railroad or steamship with whom it had contracts, and dealing with the shippers and consignees only as agents for such carriers, is not a "common carrier" within the Hours of Service Act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. 13.

For other definitions, see Words and Phrases, First and Second Series, Common Carrier.]

3. MASTER AND SERVANT 13—HOURS OF SERVICE ACT—PERSONS LIABLE— AGENT.

Though such terminal company is an agent of the common carriers with whom it has contracts, within Hours of Service Act, § 2 (Comp. St. 1913, § 8678), making it unlawful for the agents of a common carrier subject to the act to permit any employé subject to the act to work overtime, and section 3 (Comp. St. 1913, § 8679), making such agent liable to a penalty, its employés are not employés of a common carrier, so that the terminal company is not liable under the Hours of Service Act for permitting its employés to work more than 16 hours in one day, though it would be liable if it used the crews of the carriers in its operations and permitted them to work overtime.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. 13.]

In Error to the District Court of the United States for the Eastern District of New York.

Action by the United States against the Brooklyn Eastern District Terminal for penalties incurred by violation of the Hours of Service Act. Judgment for the plaintiff on an agreed statement of facts, and defendant brings error. Reversed.

Writ of error to review a judgment of the District Court against the defendant below (hereinafter called the Terminal), for penalties incurred by violation of Act March 4, 1907, commonly called the "Hours of Service Act." The case was tried on an agreed statement of facts, which admitted that the Terminal had permitted several "members of switching crews," at their own request, to remain on duty for more than 16 consecutive hours.

Henry B. Closson, of New York City, for plaintiff in error.

Melville J. France, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith, Asst. U. S. Atty., of New York City, and Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C., of counsel), for the United States.

Before COXE, ROGERS, and HOUGH, Circuit Judges.

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HOUGH, Circuit Judge. The Terminal is a corporation organized under the Transportation Corporations Law of New York (Consol. Laws, c. 63) for the purpose (as declared in its certificate of incorporation) of owning and employing vessels and other property in the business of transporting and storing merchandize in New York Harbor and the territory bordering thereon. It maintains a fleet of tugs and car floats, which convey cars to and from its station on the Brooklyn shore of the harbor, procuring and delivering such cars at the depots (mostly on the New Jersey shore) of sundry railroads; e. g., the Erie. Its own Brooklyn station contains float bridges, platforms, freight sheds, etc., all connected by railroad tracks, and does not apparently differ from many other water front freight yards in construction and arrangements. In order to haul the cars so handled from and to the bridges and places of loading and delivery, it hires several switching engines, which take "drags" of cars—i. e., one or more cars fastened to the engine—wherever they are wanted within the terminal limits. It owns no cars, and transports no passengers. To manage these "drags," so-called "switching crews" are employed by the Terminal, each consisting of a conductor, engineer, and a number of brakemen deemed sufficient.

It thus appears that the only business of the Terminal is to provide for some ten or more interstate railways, and certain steamship lines, which have no Long Island termini, a place for the receipt and delivery of freight, doing the same kind of work which the railroads themselves do at (e. g.) their New Jersey stations. This work is done in pursuance of identical written contracts with the Terminal's several patrons, under which the Terminal is paid so much per hundredweight for freight transported, receives and delivers goods in the name of (e. g.) the Erie Railroad, issues the bill of lading of the proper company, and collects freight moneys as agent, turning over all receipts in full to the patrons to which they severally belong.

The question presented by this writ is whether the Terminal is subject to the provisions and penalties of the statute invoked by the United States. The Hours of Service Act is declared by its own preamble to apply to "any common carrier or carriers, their officers, agents and employés" engaged in interstate or foreign commerce, and "employés" is defined as meaning "persons actually engaged in or connected with the movement of any train." It is admitted that the Terminal is by the carriage of goods from New Jersey to Long Island engaged in interstate transportation; indeed, that is the staple of its business.

[1] Whether a member of a switching crew is a "person actually engaged in or connected with the movement of any train" depends upon whether the drags of cars handled by these crews are "trains." This word has received construction in cases arising under the Safety Appliance Act, with the result that switching operations have been held not to be "train movement." United States v. Erie Railroad, 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019; United States v. Chicago, etc., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023. See, also, La Mere v. Railway, etc., Co., 125 Minn. 159, 145 N. W. 1068, Ann. Cas. 1915C, 667; United States v. Grand, etc., Co. (D. C.) 203 Fed. 775;

239 F.—19

Atchison, etc., Co. v. United States, 198 Fed. 637, 117 C. C. A. 34; United States v. Boston, etc., Co. (D. C.) 168 Fed. 153; United States v. Chicago Great Western, etc., Co. (D. C.) 162 Fed. 775.

In our recent decision in International, etc., Co. v. United States, 238 Fed. 317, —— C. C. A. ——, we pointed out how consistently the Safety Appliance Act had been construed to reach the mischief for which the remedy was provided; and we have no doubt the Hours of Service statute must receive the same liberal interpretation. A string of connected cars hauled on one track by one or more engines is in common speech a train. If it is to be brought within the scope of the Safety Appliance Act during mere switching operations, so that the air brake provision applies, the statute is a nuisance, not even contributing to safety; but men may as easily work beyond the limits of reliability and health on "drags" of cars as on the same number of cars traveling the open road; indeed, we think the work in yards probably more onerous and exacting.

The object of this statute is the preservation of efficiency by keeping the body sound, and, having regard to that legislative purpose, we have no hesitation in holding that the "switching crews" of the Terminal were "engaged in the movement of a train," within the meaning of the statute, although the same collocation of cars and engines would not be within the air brake provision of the Safety Appliance Act, when engaged in switching operations only.

[2] This statute, however, applies solely to "*common* carriers," it is so explicitly stated. That the Terminal is a carrier cannot be doubted, but a common carrier is one who by virtue of his calling undertakes to transport personal property from one place to another for all such as may choose to employ him, and every one who so carries and delivers for compensation the goods of all persons indifferently, is a common carrier. United States v. Ramsey, 197 Fed. 144, 116 C. C. A. 568, 42 L. R. A. (N. S.) 1031.

The point is too plain to need elaboration; this plaintiff in error is not a common carrier, for it transports only for those it has contracts with, and only such goods as its patrons intrust to it; it does not carry for "all persons indifferently." It is, however, the agent of several common carriers, employed by them to discharge to the public the duties of common carriage assumed by those railways and steamship companies which hire the Terminal for that purpose. United States v. Union Pacific, etc., Co., 213 Fed. 332, 130 C. C. A. 34. The same reasoning which finds the Terminal a common carrier, would necessarily apply the same term to every teamster who with his own vehicle collects and delivers goods for (e. g) an express company under a yearly contract. The test is that shippers and consignees have no contractual relation with the Terminal; they deal with the common carriers, as disclosed principals, through the Terminal as agent.

[3] There remains the question whether an agent of a common carrier subject to the statute may not be liable to the penalties thereby prescribed. Doubtless this is often the case; for section 2 declares it unlawful for the "agents" of any common carrier "subject to this act" to permit any employé "subject to this act" to do what the Terminal's

switching crew did, and section 3 declares "such" agent to be liable to a penalty. But these words necessarily depend for scope and effect on the declaratory preamble, which states that the act applies only to *common* carriers engaged in the described commerce and "*their* officers, agents, and employés." This limits the word "employés" to those of a common carrier, and does not permit its extension to the servants of an agent which is not itself a common carrier.

Thus if (e. g.) the Erie Railroad switched its own cars in the Terminal's yard, with its own crews, those men would be subject to the act, and if the Terminal, as the Erie's agent, compelled or permitted them to work overtime, liability would attach both to Erie and Terminal; but the employés of the Terminal itself are not within statutory language too explicit to admit doubt or require construction. See Baltimore, etc., Co. v. Interstate, etc., Com'n, 221 U. S. 617, 31 Sup. Ct. 621, 55 L. Ed. 878.

Judgment reversed.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes