WALDUM, Appellant, vs. LAKE SUPERIOR TERMINAL & TRANSFER RAILWAY COMPANY and another, Respondents.

*January 10—April 29, 1919.*

*Evidence: Judicial notice: Reports to railroad commission: Common carriers: Who are? Statutes: Construction: Workmen's compensation: When act does not apply to railway employees: Industrial commission: Decisions on questions of law not binding: Jurisdiction: Waiver: Acceptance of compensation act by employee.*

1. Judicial notice is taken of the annual reports and the tariffs filed by a railway company with the railroad commission.
2. A common carrier is one who undertakes for hire or reward to transport from place to place the goods of such as choose to employ him.

3. It is not so much the extent of the use which the public makes of the facilities owned and operated by a railway company which determines its true character as a carrier, as it is the right of the public to require the services which the company is equipped to perform.

4. A terminal and transfer railway company, organized and owned by four other railway companies whose lines entered a city, owns steam locomotives but no cars. Its tracks run from the termini of the other companies to the various industries, docks, and elevators in the city, and it is bound to transport thereon, upon a tariff basis approved by the railroad commission, all cars offered to it, not only by the four owning companies, but by any other railway company. *Held*, that it is "operating a steam railroad as a common carrier," within the meaning of sub. (3), sec. 2394—8, Stats. 1915, and an employee injured in its service was not subject to the workmen's compensation act unless both employer and employee had accepted in writing the provisions of the act.

5. The facts that nearly the whole of the business transacted by the company in question is done for the four railway companies which own it; that it settles with such companies under special contracts; and that it handles no freight except such as it receives from or through other railway companies, so that shippers must contract for its services through other carriers, are not material, the significant facts being that the transportation service it renders is in every instance a part of the service contracted for by a shipper, and that any shipper may at any time command such service.

6. The history of the provisions of the workmen's compensation act relating to railroad companies confirms the construction above given to the words "common carrier" as used in sub. (3), sec. 2394—8, Stats. 1915.

7. A practical construction, however long adhered to, cannot override the plain terms of a statute.

8. The question whether the business transacted by a railway company is that of a common carrier or a private carrier is a question of law, and courts are not bound by the decisions of administrative bodies in regard to constitutional and legal questions. The rule that findings of fact by the industrial commission must be upheld if supported by any substantial credible evidence is not applicable to such questions.

9. Under sub. (3), sec. 2394—8, Stats. 1915, where an employee who was injured while switching cars for a railroad company operating a steam railroad as a common carrier was not subject to the compensation act because he had not accepted its provisions, the industrial commission had no jurisdiction of

the subject matter of an award of compensation for the injury, and the employer could not, even by stipulation, confer jurisdiction or waive the lack of it.

10. Although an employee of a railroad company operating a steam railroad as a common carrier became subject to the compensation act soon after its enactment (ch. 50, Laws 1911), by reason of the company's election to come under the act, yet where his subsequent employment had not been continuous he was not subject to the act after the enactment of sub. (3), sec. 2394—8, by ch. 599, Laws 1913, unless he filed the notice of acceptance therein provided for. [Whether he would have continued to be subject to the act if his employment had been continuous, not decided.]

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

Plaintiff was injured August 30, 1916, at Superior, while working for the *Lake Superior Terminal & Transfer Railway Company,* hereinafter referred to as the *Railway Company.* At the time of the accident he was engaged in switching a string of empty box cars from the yards of the Northern Pacific Railway Company to the C. Reiss Coal Company's dock in the city of Superior. He was on top of a box car which was struck by other cars, and he was thrown under the cars and suffered injuries which resulted in the loss of his left arm. He had been employed by the *Railway Company* off and on since 1908. The *Railway Company* made application to the *Industrial Commission* for adjustment of compensation under the terms of the workmen's compensation act. Plaintiff claimed that the *Industrial Commission* had no jurisdiction because the employees of the *Railway Company* were not subject to the workmen's compensation act. The *Industrial Commission* after a careful examination held that it had jurisdiction and made an award. Plaintiff brought an action in the circuit court for Dane county to set aside the award, and upon hearing the circuit court made an order confirming the award, and judgment was entered thereon, and from such judgment plaintiff brings this appeal. Other material facts are stated in the opinion.

*W. P. Crawford* of Superior, for the appellant.

*J. A. Murphy* of Superior, for the respondent *Lake Superior Terminal & Transfer Railway Company.*

For the respondent *Industrial Commission* there was a brief by *Spencer Haven,* attorney general, and *Winfield W. Gilman,* assistant attorney general, and oral argument by *Mr. Gilman.*

The following opinion was filed February 4, 1919:

ROSENBERRY, J.    Sub. (3), sec. 2394—8, Stats. 1915, is as follows: "The provisions of sections 2394—3 to 2394—31, inclusive, shall not apply to employees operating, running or riding upon, or switching freight or other trains, engines or cars for a railroad company operating a steam railroad as a common carrier," unless both employer and employee shall have accepted the provisions of the act in writing.    The *Railway Company* admits that it is organized as a railroad company and is authorized by its charter to do business as a common carrier, but contends that it does not operate a steam railroad as a common carrier.

The main question in this case is, Was the *Railway Company* at the time in question operating a steam railroad as a common carrier?    The *Railway Company* is incorporated under sec. 1820, ch. 87, Stats., which authorizes the formation of a corporation for the "purpose of constructing, maintaining and operating a railroad for public use in the conveyance of persons or property," etc., and provides that upon the issuance of the patent provided for in the section the corporation so formed "shall possess all the powers and privileges and be subject to all the provisions of the law regulating railroad corporations."

Sec. 3214, Stats. 1915, provides:

"Every association or company formed for the transportation of passengers or property, either by boats, vessels, stages or other means, shall make a statement of the names of the persons comprising such association or company and

file a copy of the same in the office of the clerk of the circuit court of each county through or into which it may transact business. All persons, companies and corporations engaged in any such business shall be deemed common carriers."

The following facts are substantially undisputed: The *Railway Company* was incorporated by four railroads entering the city of Superior: the Great Northern Railway Company, the Northern Pacific Railway Company, the Duluth, South Shore & Atlantic Railway Company, and the Chicago, St. Paul, Minneapolis & Omaha Railway Company; and by their joint action they fix and determine its policies. The tracks of the *Railway Company* run from the termini of the railroad companies which it serves to the various industries, docks, and elevators of Superior, about 100 in number. The *Railway Company* has filed its annual reports as a railroad company with the railroad commission of Wisconsin from 1914 to 1917, inclusive. On November 16, 1911, it filed its tariffs with the railroad commission, effective October 15, 1911, by which tariffs it is bound to transport loaded cars from one carrier to another, or from a carrier to an industry on its own tracks, or from connecting roads to industries on the Tower Bay front, at from $1 to $3 per car; to transport loaded cars from one industry to another at three quarters of a cent per hundredweight of contents; to handle less than carload lots from a connecting carrier to an industry and from one industry to another at five cents per hundredweight. The fact that it settles with the owning companies on a basis of cost is immaterial. While the reports and tariffs were not proved, we take judicial notice of them. *Chicago & N. W. R. Co. v. Railroad Comm.* 156 Wis. 47, at p. 62, 145 N. W. 216, 974. The *Railway Company* owns no passenger or freight cars, but has eleven steam locomotives and employs from thirty to seventy men. As the business is actually conducted, the principal part of it is taking cars from the owning companies, switching them to plants, docks, and elevators, and returning them to the owning com-

panies.    At the time of its organization ninety-nine per cent. of its total business was transacted for the owning companies.    In recent years about ninety per cent. of its business has been transacted for the same companies, the ten per cent. remaining being made up of work the *Railway Company* does for other connecting railroads and a small amount of business done for the public.    The articles of incorporation contain the following provision:

"The general nature of the business of this company shall be to acquire depot, storing, yard and shop grounds, construct, maintain, use and operate for public use railroad lines and tracks, buildings, depots, depot grounds and storage tracks and shops and other railroad conveniences and appliances, in the county of Douglas, in the state of Wisconsin, for the transportation of rolling stock, freight and passengers, and for the purpose of connecting any and all the other various lines of railroad running to or into the said county of Douglas, and for the purpose of transferring rolling stock, freight and passengers between such railroads and between such railroads and docks and piers and vessels touching at any port or place in the county, and generally to exercise powers conferred by the statutes of the state of Wisconsin relative to the organization and powers of railroad corporations."

The *Railway Company* has not handled for the general public any freight other than what is contained in the cars of some other railroad.    The business transacted for local industries is not accepted directly by the *Railway Company,* but is contracted for through some of the owning companies. Waybilling and arrangements for shipment over its tracks are taken care of by the companies whom it serves.    It has no ticket office and handles no freight except such as it receives from or through other railroad companies.

A common carrier is defined as one who undertakes for hire or reward to transport the goods of such as choose to employ him, from place to place.    This definition is ap-

proved in *Doty v. Strong,* 1 Pin. 313, at p. 324.   See 10 Corp. Jur. 339, note 35.

What did the legislature mean by exempting the employees of "a railroad company operating a steam railroad as a common carrier?"   Obviously it left subject to the act the employees of all railroad companies operating by electricity or other motive power than steam.   By limiting the exemption to the employees of a railroad company which operates a steam railroad as a common carrier, it made subject to the act the employees of the numerous railway companies operating as private carriers within the state, such as logging railroads and other like railroads operated for private purposes. We are not disposed to rest this decision upon narrow technical grounds, but rather upon broad general principles, and to ascertain and if possible give effect to the intent of the legislature, which is after all the primary purpose in the construction of this or any other statute.

What the *Railway Company* in fact does is to accept for transportation for hire the property of all persons who have any need of the services which it is equipped to render.   Under its contract and tariffs it must transport all cars offered to it by any of the companies which it serves, and the transportation service which it renders is in every instance a part of the service contracted for by a shipper.   The fact that the shipper must contract for the service through another carrier is immaterial.   The distinctive feature is this: any shipper may at any time command the transportation services of the *Railway Company.*   It is bound to serve not only the owning companies, but all other companies similarly situated, upon a tariff basis approved by the railroad commission; and no doubt, should still other railroad companies tender it cars for transportation, it would also be obliged to accept and transport such cars under its tariffs.   The fact that it settles with the owning companies under special contracts is not significant in this connection.   It may not de-

cline to render the service which it is equipped to perform and which it holds itself out as being ready, able, and willing to perform, whether that service be for the owning companies or for other companies.   It is not so much the extent of the use which the public may make of the facilities owned and operated by the railway company which is determinative of its true character as it is the right of the public to require the services which the railway company is equipped to perform.   *Union L. Co. v. Railroad Comm.* 144 Wis. 523, 129 N. W. 605; *Tap Line Cases,* 234 U. S. 1, 24, 34 Sup. Ct. 741. Here, the right of all shippers to have the services of the *Railway Company* in the transportation of property for hire makes it a common carrier.

All of the service which the *Railway Company* renders is in part performance of a contract of shipment made by a common carrier, and in completing the contract of carriage it does its work in exactly the same manner that the railroad companies would do it if they operated their own cars and engines over its tracks.   For convenience it transacts a part of the common carrier business of the companies which it serves under a separate organization.

It is equipped to perform a limited service, but everything it does do, it does in the transportation of persons and property for hire exactly as any common carrier would perform the same service.   The fact that the terminal service in some instances is rendered under a special contract at cost does not change the nature of the operation by which it is rendered. The hazards to which the employees of the *Railway Company* are exposed are the hazards common to the employees of all steam railroads operated by common carriers.

The *Railway Company* not only operates in the same manner that a common carrier operates, but it is a common carrier, and we are persuaded that the language of the act was used advisedly by the legislature, particularly upon a consideration of the state of the law at that time, including the provisions of our statutes and a history of the provisions of

the workmen's compensation act relating to railroad companies. The workmen's compensation act was ch. 50 of the Laws of 1911. Sec. 1 of that act (sec. 2394—3, Stats.) contains the following provision:

"Except as regards employees working in shops or offices of a railroad company, who are within the provisions of subsection 9 of section 1816 of the statutes, the term 'employer' as used in sections 2394—1 and 2394—2 shall not include any railroad company as defined in subsection 7 of said section 1816," etc.

Sec. 1816 relates to the liability of a railroad company for personal injuries sustained by its employees, and by sub. (7) a railroad company is defined as follows:

"Any company, association, corporation, or person managing, maintaining, operating, or in possession of a railroad in whole or in part within this state whether as owner, contractor, lessee, mortgagee, trustee, assignee or receiver."

"Employer" was defined by sec. 2394—5 as follows:

"(2) Every person, firm, and private corporation (including any public service corporation), who has any person in service under any contract of hire, express or implied, oral or written, and who, at or prior to the time of the accident to the employee for which compensation under sections 2394—1 to 2394—31, inclusive, may be claimed, shall, in the manner provided in the next section, have elected to become subject to the provisions of sections 2394—1 to 2394—31, inclusive, and who shall not, prior to such accident, have effected a withdrawal of such election, in the manner provided in the next section."

On the 31st day of May, 1912, the Minneapolis, St. Paul & Sault Ste. Marie Railway Company filed an election whereby it attempted to become subject to the provisions of ch. 50 of the Laws of 1911, and in *Minneapolis, St. P. & S. S. M. R. Co. v. Industrial Comm.* 153 Wis. 552, 141 N. W. 1119, it was held that the railroad company might accept the act as to all its employees, and that it was not limited by the

act to that class of employees described in sub. (7) of sec. 1816, being shop and office employees.    The court said:

"The compensation act . . . affords railway companies competency to come under it, placing all their employees on the same favored plane as other employees in industrial pursuits."

Whether the employees or the railroad companies moved we do not know, but at the next session of the legislature the law was amended by ch. 599 of the Laws of 1913, and the provision sub. (3) of sec. 2394—8 was re-enacted by the Laws of 1915, ch. 316, the material provisions of which are hereinbefore stated.    The language under consideration came in by way of amendment after the subject had been reconsidered.    We must assume that the words of the amendment were chosen with reference to their established legal meaning.    What did the term "common carrier" as there used include?

In *State ex rel. Northwestern C. R. Co. v. Willcuts,* 140 Wis. 448, 122 N. W. 1048, decided at the August term, 1909, this court had under consideration the question whether or not the property of the Northwestern Coal Railway Company within the city of Superior was subject to local taxation.    That company had about eight miles of tracks, including its switch tracks, and its principal business was taking empty cars to the dock and returning them loaded with coal to the connecting railways, the connecting railways being the four companies which own the *Railway Company* whose rights are in question here.    There, as here, it was insisted that although organized as a railway company it was operating its railroad for a private and not for a public purpose.    It was there said:

"Under the law in relation to the subject under consideration, the question is whether the property is necessarily used for a public or *quasi*-public purpose in order to enable the plaintiff to perform its duty as a common carrier. . . ."

The court further said:

"The mere fact, however, that a large part of the business of plaintiff was done for the Pittsburgh Coal Company in which it is interested did not deprive plaintiff of its character of common carrier or render its property devoted to a private use so long as it was in 'fact organized as a common carrier and serving the public in that capacity, although to a limited extent because of location and conditions which limited such service. . . . Whether the property of plaintiff is devoted to a public use is not determined by the extent of the use, but by the right of the public generally to use it, and the fact that it is used for public purposes by all who desire to use it.

"Upon the admitted facts as they appear from the record we see no escape from the conclusion that the plaintiff was a common carrier and its property devoted to a public use, and, though limited in the extent of such business, it was doing the business of a common carrier. Its road and switch tracks were subject to use by all the public. The road carried for the public generally between its termini, the coal dock and several other railroads." *State ex rel. Northwestern C. R. Co. v. Willcuts,* 140 Wis. 448, 453, 454, 122 N. W. 1048, 1050.

It is strenuously insisted that this case involved a question of taxation and that it was necessary to go no further than to hold that the property of the company was devoted to a public use, and that the decision should be so limited. Whether that be true or not, the use of the words "common carrier" shows how it was commonly used and understood at that time. We need not go further.

In 1909 two cases involving substantially the same question involved in this case had been decided in the federal courts *(U. S. v. Sioux City S. Y. Co.* 162 Fed. 556, and *Union S. Co. v. U. S.* 169 Fed. 404) ; and after the enactment of ch. 50 of the Laws of 1911, and before the amendment by ch. 599 of the Laws of 1913, the case of *U. S. v. Union S. Y. & T. Co.* (226 U. S. 286, 33 Sup. Ct. 83) was decided by the supreme court of the United States. The

gist of the cases is set forth in a statement made by Mr. Justice VAN DEVANTER while a circuit judge, found in 169 Fed. 404, and restated with approval in 226 U. S. at page 305, 33 Sup. Ct. 88, as follows:

"Its [the Stock Yards Company's] operations . . . include the maintenance and use of railroad tracks and locomotives, the employment of a corps of operatives in that connection, and the carriage for hire over its tracks of all live stock destined to or from the sheds or pens, which, in effect, are the depot of the railroad companies for the delivery and receipt of shipments of live stock at South Omaha. The carriage of these shipments from the transfer track to the sheds or pens and *vice versa* is no less a part of their transit between their points of origin and destination than is their carriage over any other portion of the route. True, there is a temporary stoppage of the loaded cars at the transfer track, but that is merely incidental and does not break the continuity of the transit any more than does the usual transfer of such cars from one carrier to another at a connecting point. And it is of little significance that the Stock Yards Company does not hold itself out as ready or willing generally to carry live stock for the public, for all the railroad companies at South Omaha do so hold themselves out, and it stands ready and willing to conduct, and actually does conduct, for hire a part of the transportation of every live-stock shipment which they accept for carriage to or from that point, including such shipments as are interstate."

In *Texarkana & Ft. S. R. Co. v. Rosebrook-Josey G. Co.* 52 Tex. Civ. App. 156, 114 S. W. 436, the same question was before the court of civil appeals of the state of Texas, which held that a railroad company switching cars from its switch tracks to and from warehouses situated on its spurs and switches and delivering them upon the transfer tracks of other railroad companies in the same town was a common carrier while engaged in such business.

We must presume that the legislature adopted the language here under consideration with a full understanding of its established legal effect, particularly as used in our stat-

utes and decisions, and it can scarcely be doubted that when it said in 1913 that the workmen's compensation law, which, prior thereto, was held to apply to the employees of all railroad companies, was amended so as to exclude employees of all railroad companies operating steam railroads as common carriers, it intended to exclude the employees of the *Railway Company* along with the employees of all other companies organized as railroad companies and doing business as common carriers. With the policy of the law we have nothing to do; that is a matter for the consideration of the legislature. There all parties in interest can be heard; here they cannot. We consider here the construction of the language used by the legislature. It is our duty to interpret, not to legislate. The words of the act are plain and unambiguous. While the *Railway Company* does not do all that some common carriers do, everything done by it is done as a common carrier; it is therefore operating a steam railroad as a common carrier.

We are referred to *Brooklyn E. D. Terminal v. U. S.* 239 Fed. 287, decided January 9, 1917, and to *U. S. v. Union Pac. R. Co.* 213 Fed. 332, as decisive of the question that the *Railway Company* is not a common carrier. It is there laid down that the test is whether or not shippers and consignees have contractual relations with the terminal. With all due deference, we do not think the test laid down is the correct test. We think the correct test is that stated in *Northwestern C. R. Co. v. Willcuts,* 140 Wis. 448, 122 N. W. 1048, and approved in *Tap Line Cases,* 234 U. S. 1, 24, 34 Sup. Ct. 741; that is, the right of the public to use the railroad's facilities and to demand service of it, rather than the extent of its business, is the real criterion determinative of its character. In this case the *Railway Company* cannot limit the right of any shipper to use its facilities, and the fact that the shipper must contract for its service through the agency of another company is immaterial. The fact that any shipper can make a contract by virtue of which the *Rail-*

bodies in regard to constitutional and legal questions. *Wis. Tel. Co. v. Railroad Comm.* 162 Wis. 383, 156 N. W. 614.

It is also argued that the appellant, by appearing before the *Industrial Commission,* waived his right to object to the jurisdiction of the *Commission.* If the *Industrial Commission* had no jurisdiction of the subject matter, which is the question here involved, there being no claim that the employee had accepted the provisions of the act as amended, the parties could not even by stipulation confer jurisdiction. 15 Corp. Jur. 802, § 101, and cases cited.

After the enactment of ch. 50 of the Laws of 1911 the *Railway Company* elected to come under the act. As the act then stood, this brought employees under the act unless they filed a withdrawal. The plaintiff never filed a withdrawal, but his employment with the *Railway Company* was intermittent, although during the greater part of the time since 1911 he has been employed by the *Railway Company.* The act as it stood at the time of plaintiff's injury provided that it should not apply to employees of a railroad company operating a steam railroad as a common carrier, "unless both employer and employee shall specifically in writing have voluntarily accepted the provisions of said sections [the compensation act] and have filed notice thereof with the industrial commission," etc.

Where the employment has not been continuous and no election has been filed by the employee subsequent to the amendment, the employee is not subject to the provisions of the act. Whether or not he would be if his employment had been continuous we do not decide. The fact that the plaintiff may have been under the compensation act by reason of the election of the *Railway Company* made prior to the amendment is not sufficient to place him under the act as amended, under the facts and circumstances in this case. It appears that the *Railway Company* has elected to be subject to the act as amended. If any one or all of the employees de-

*way Company* under its tariffs is obliged to render the service contracted for, is the material thing.    This rule was laid down by this court prior to the enactment of the amendment in question, and we see no reason why it should be overruled or amended.    Neither do we think the principle that a railroad may be a common carrier of merchandise, but is not a common carrier of common carriers of merchandise (*Donovan v. Pa. R. Co.* 120 Fed. 215, 61 L. R. A. 140, and *Pullman P. C. Co. v. Mo. Pac. R. Co.* 115 U. S. 587, 6 Sup. Ct. 194, and *Express Cases,* 117 U. S. 1, 6 Sup. Ct. 542, 628), is in any way applicable.    The *Railway Company* contracts and holds itself out by its tariffs as being ready, able, and willing to perform the service of delivering to destination all persons and property delivered to it in cars, and for such service it receives compensation.    Manifestly what it receives compensation for is the transportation of persons and property.

It appears that the *Railway Company* accepted the provisions of the workmen's compensation act, and that since its enactment many adjustments have been made with its employees in accordance with its provisions.    While this practical construction of the act given it by the *Industrial Commission* might be of weight if the meaning of the statute were doubtful, a practical construction, however long adhered to, cannot override the plain terms of the statute. *Smith v. State,* 161 Wis. 588, 155 N. W. 109; *Burkhardt M. & E. P. Co. v. Hudson,* 162 Wis. 361, 156 N. W. 1011.

The trial court found itself bound by the established rule that findings of fact of the *Industrial Commission* must be upheld if supported by any substantial credible evidence. This is an incorrect application of the rule.    The question involved here is not one of fact but of law.    The amount of business done and the method of transacting it are questions of fact; whether the business so transacted is that of a common carrier or a private carrier is a question of law, and courts are not bound by the decisions of administrative

sire the benefit of the act, an election may be filed and notice given, and as to any injury occurring subsequently the act will apply.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with directions to enter judgment setting aside the award and directing dismissal of the application.

A motion for a rehearing was denied, with $25 costs, on April 29, 1919.