# STATE AND RAILROAD AND WAREHOUSE COMMISSION v. ROCK ISLAND MOTOR TRANSIT COMPANY.[1]

December 27, 1940.

Nos. 32,739, 32,740, 32,741, 32,753, 32,790.

[1]Reported in 295 N. W. 519.

106

[redacted]

*J. A. A. Burnquist,* Attorney General, and *George T. Simpson,* Assistant Attorney General, for appellants State and Railroad and Warehouse Commission (No. 32,739).

*Stinchfield, Mackall, Crounse & Moore,* for appellants Regulated Motor Transportation Association, Raymond Bros. Motor Transportation, Inc., Steller Transportation Company, and Witte Transportation Company (Nos. 32,740, 32,741, 32,753).

*Jackson & Yackel,* for appellant Murphy Motor Freight Lines, Inc. (No. 32,753).

*George L. Siegel,* for appellant Brotherhood of Railroad Trainmen (No. 32,790).

*O'Brien, Horn & Stringer,* for respondent.

PETERSON, JUSTICE.

The question for decision is whether or not respondent is entitled to a "permit" as a contract carrier by motor transportation under L. 1933, c. 170. The statute has been amended in respects not here material. 3 Mason Minn. St. 1940 Supp. §§ 5015-20 to 5015-44. The railroad and warehouse commission denied the permit, and on appeal the district court reversed the commission.

Respondent is an Illinois corporation the stock of which is wholly owned by the trustees in bankruptcy of the Chicago, Rock

Island & Pacific Railway Company. The bankruptcy proceedings of the railroad are pending in the United States District Court for the Northern District of Illinois, Eastern Division. For convenience, we shall refer to the trustees as the railroad.

The railroad is a common carrier by railroad of passengers and freight with lines, among others, extending from Minneapolis and St. Paul, Minnesota, to Des Moines, Iowa.

The bankruptcy court on the railroad's petition authorized it to enter the field of motor transportation between the points mentioned. Acting under the authorization, the railroad acquired the stock ownership of respondent, which operates as an interstate common carrier of freight by motor transportation between said points. Upon such stock acquisition, one of the trustees in bankruptcy and the secretary-treasurer of the railroad became the president and the secretary-treasurer, respectively, of respondent.

After the railroad acquired the ownership of its stock, respondent continued to be, as it had been, an interstate common carrier of freight by motor vehicle over public highways under certificate of public convenience and necessity issued by the interstate commerce commission under the federal motor carrier act of 1935, 49 USCA, §§ 301-327.

Thereafter respondent applied to the state commission for a permit as an intrastate contract carrier of freight by motor transportation over public highways paralleling the railroad's lines between Minneapolis and Gordonville, Minnesota, for the purpose of serving all cities, villages, or places served by the railroad between said points.

The commission, being in doubt as to the propriety of issuing a permit, ordered a hearing. The state of Minnesota, the Regulated Motor Transportation Association, the Brotherhood of Railroad Trainmen, and numerous carriers by motor transportation over public highways opposed the application. The commission conducted an extensive hearing in which it took much evidence.

The respondent's proposed plan of operation was under a contract and arrangement with the railroad. The contract was to

become effective when and if a permit was granted and was to continue only so long as such permit, or a renewal thereof, remained in force.

The contract, so far as here material, provided that respondent was to transport in its trucks over the public highways with reasonable dispatch and care for the railroad such less-than-carload lots of freight as the railroad might tender. For such transportation the railroad was to pay respondent the minimum rates prescribed by the commission monthly on or before the tenth day of the succeeding month. The agreed transportation was to be confined to property received by the railroad at a depot, station, or siding. Delivery thereof was to be at a depot, station, or siding as directed by the railroad. All the freight was to move under the railroad's bills of lading. Respondent was not to issue any receipt, bill of lading, or contract for the carriage of any property to be transported under the contract. Respondent was not to transport for others, nor hold itself out as a common carrier or as the agent of the railroad.

The contract further provided that the railroad assumed all liability for the adjustment and payment of claims for loss and damage to property and delay in such transportation, except such as were due to respondent's negligence. Respondent was to carry public liability insurance.

The arrangement between the railroad and the motor company contemplated that the railroad was to have the exclusive solicitation of all freight business, that shippers were to do business exclusively with the railroad, which would receive the freight as if it were to be shipped by rail, and that it would decide in the particular case whether the transportation was to be by it by rail or by the respondent by truck. Shippers were not to know whether transportation of their freight was to be by the one way or the other. The railroad was to collect all freight charges.

The respondent under the arrangement was not to do any store-door pickup or store-door delivery.

Respondent contended that it was entitled to a permit as a "contract carrier" under L. 1933, c. 170. The objectors contended that respondent was not entitled to a permit as such contract carrier on the grounds that the commission was not authorized to issue to it such a permit (1) because of its stock ownership by the railroad, and (2) because the proposed operation by respondent was not as a contract carrier under L. 1933, c. 170, but as a common carrier by motor transportation over the public highways between fixed termini or over a regular route, which could be authorized only under a certificate of public convenience and necessity under L. 1925, c. 185, 1 Mason Minn. St. 1927, §§ 5015-1 to 5015-19.

The commission adopted the views of the objectors and denied the application for the permit. The district court on appeal adopted the contrary view and set aside the order of the commission denying the permit as unlawful and unreasonable. A motion in the alternative was made for amended findings or a new trial, which was denied. Then judgment was entered. All the objectors appealed from the order and the judgment.

■ Respondent moved to dismiss all the appeals except those of the state and the commission. All the appeals raise the same questions. The scope of our decision must be the same whether we hear some or all of the parties.

The motion to dismiss is upon the following grounds: (a) That the appellants other than the state and the commission "are not parties to this action or proceeding"; (b) that said appellants have no interest in the subject matter; and (c) that the order denying the motions for amended findings or new trial is not appealable.

(a) The matter came on for hearing before the commission on the application of the motor company for a permit and the notice of hearing issued by the commission. All the appellants appeared in response to the notice. No written objections to the granting of the permit were filed. The appearances, except that of the Brotherhood of Railroad Trainmen, were formally entered of record, and the appellants were designated as "objectors." Then the

hearing proceeded with all parties participating. The representative of the Brotherhood was as active a participant in the proceedings as the attorneys representing parties who appeared formally. A reading of the record shows that the commission regarded and treated all of them as parties. All this was without objection by respondent here.

The situation with respect to parties was similar on the appeal from the commission to the district court. Under the statute such appeals are "tried de novo" by the district court. L. 1933, c. 170, § 19. At the opening of such trial formal appearances were entered by all appellants except the Brotherhood. Then a stipulation was made by the parties of record in open court to submit the matter on the record before the commission supplemented by such evidence as the parties might desire to offer. In the court below, as before the commission, there was full participation in the proceedings by all appellants except the Brotherhood, without objection by respondent. After decision below, all the appellants, including the Brotherhood, made a motion for amended findings or a new trial. No objection was made to the appearance of the Brotherhood in the proceedings, and the order denying the motion recited its appearance.

One who appears as an actor in a litigation or proceeding claiming or asserting an interest in the subject matter thereof is a party. It makes no difference that the party has failed to file a written pleading. The pleading may be waived where there is a voluntary trial of the issue which the pleading would have raised. McAlpine v. Kratka, 92 Minn. 411, 100 N. W. 233, *infra,* p. 111 (no pleadings); Kief v. Mills, 147 Minn. 138, 179 N. W. 724; Lyford v. Martin, 79 Minn. 243, 82 N. W. 479; 5 Dunnell, Minn. Dig. (2 ed.) § 7630 (failure to file a reply); Thomas v. Bibb, 44 Ala. 721 (failure to file a complaint); Brazzle v. Usher (Breese 35) 1 Ill. 35; and Ducote v. Ducote, 183 La. 886, 165 So. 133 (failure to file a plea or answer). Some courts look upon such appearances with favor. In Henderson v. Henderson, 247 N. Y. 428, 432, 433, 160 N. E. 775, 777, the defendant without filing an

answer made an oral appearance by his attorney, who stated that his appearance was special for the purpose of raising only jurisdictional questions, but he actually participated in the trial on the merits. The court held that he became a party by becoming an "actor" in the litigation "participating in the merits," and said: "The statute prescribes the forms of pleadings, yet parties may try a case, if they will, without reference to the pleadings." In our opinion the appellants were parties in law as well as in fact.

Respondent here is estopped to claim that the appellants referred to have no interest in the subject matter. In McAlpine v. Kratka, 92 Minn. 411, 100 N. W. 233, McAlpine appealed as a creditor from an order of the probate court allowing an administrator's account. No pleadings were filed in the district court. The trial was had upon the assumption that McAlpine was in fact a creditor entitled to appeal. The record showed only that McAlpine claimed to be a creditor as appeared from the claim register in the probate court. There was no showing that his claim had been allowed or that he was in fact a creditor. On appeal to this court it was contended, as here, that the appellant was without interest. We said [92 Minn. 412]:

"When the cause was brought on for hearing in the district court, no question was raised as to McAlpine's right to appeal, and it seems that this was taken for granted. The entire hearing was upon the theory that there was a proper contestant of the administrator's account before the court, and it is now too late to attack his right upon the grounds suggested on this review."

It is generally held that an appellee or respondent, by making the appellant a party to the litigation or proceeding, is estopped to deny that the appellant has a sufficient interest to entitle him to prosecute an appeal. Domestic Bldg. Assn. v. Nelson, 172 Ill. 386, 50 N. E. 194; 4 C. J. S., Appeal and Error, § 179. By bringing the appellants in as parties in the district court and litigating the matters involved here by consent, all the parties proceeded

upon the assumption, as did the court below, that appellants had an interest in the subject matter.

The cases of State v. Tri-State Tel. & Tel. Co. 146 Minn. 247, 178 N. W. 603, and Steenerson v. G. N. Ry. Co. 60 Minn. 461, 62 N. W. 826, are not in point for the reason that in each of those cases there was no appearance or litigation by consent and the presence of the party claiming the right to appear was objected to at the first opportunity below. In the Steenerson case the objection was made before the commission and sustained by it, but the ruling was reversed by the district court. In the Tri-State Tel. & Tel. Co. case, it did not appear that the party had been a party of record before the commission. The objection was made in and sustained by the district court. Here no such objection was made below, and it is made here for the first time.

Respondent, in view of the presence here of the state and the commission as parties entitled to appeal, cannot raise the questions stated on appeal for the first time. The presence of a misjoined party is not objectionable in the appellate court. Breault v. Merrill & Ring Lbr. Co. 72 Minn. 143, 75 N. W. 122. Here there was no technical misjoinder, since all the parties appeared separately. But they joined in supporting the same contentions below, and for all practical purposes their standing is no different than parties misjoined. It is too late to assert that such parties are not entitled to be heard.

(b) An order denying motion for amended findings and conclusions of law or a new trial is not a final order within the meaning of 1 Mason Minn. St. 1927, § 4659, under which these appeals were taken. The statute permits an appeal from a final judgment or a final order "in the same cases and manner as in civil actions." Appellants do not claim that the order in question is a final judgment. Hence the only question is whether or not it is a final order.

The right to appeal is statutory. Appellants contend that the statute in question grants the right of appeal in the same cases and in the same manner as the statutes relating to appeals in

ordinary civil actions. In this they are in error. The right of appeal here is limited to final judgments and final orders. The provision that such right shall be in the same cases as in civil actions simply means that the finality and hence the appealability of the judgment or order shall be determined by the rules applicable to analogous cases in civil actions. The words that the appeal shall be taken in the same manner as in civil actions simply means that the procedure in appeals in civil actions shall be followed.

An order denying a motion for amended findings of fact and conclusions of law is not appealable, as we have repeatedly held. Nash v. Kirschoff, 161 Minn. 409, 201 N. W. 617. The order refusing to amend or modify is, like the order sought to be amended or modified, in the nature of an order or direction for judgment, and for that reason lacking in finality. Shepard v. Pettit, 30 Minn. 119, 14 N. W. 511.

An order denying a motion for new trial is not a final order. It is an interlocutory order which does not determine the rights of the parties so as to dispose of the case. Wells v. Wells, 105 Ohio St. 471, 138 N. E. 71; First Nat. Bank v. McCullough, 50 Or. 508, 93 P. 366, 17 L.R.A.(N.S.) 1105, 126 A. S. R. 758. An order denying a motion for new trial is appealable under 2 Mason Minn. St. 1927, § 9498, not as a final order but as one of the enumerated orders from which an appeal is authorized without qualification or elaboration. Barrett v. Smith, 183 Minn. 431, 436, 237 N. W. 15.

It being conceded that an appeal lies from the judgment, the motion to dismiss the appeals from the judgment of Raymond Bros. Motor Transportation, Inc., Steller Transportation Company, Witte Transportation Company, and the Regulated Motor Carriers Association are denied. The appeals of the same companies from the order denying their motions for amended findings and conclusions of law are dismissed upon the grounds that the order is not a final order within the meaning of the statute.

(c) The appeals of the other appellants as to whom dismissal is sought are from both the final judgment and the order denying

their motions for amended findings and conclusions of law. As has been indicated, if separate appeals had been taken from the judgment and from the order, the appeals from the order should be dismissed. In determining the reviewability of decisions from which an appeal is taken, the appealable and the nonappealable should be treated as separable. The appealable part has been separated from the nonappealable part in cases involving orders. In cases involving an appeal from an order denying a motion in the alternative for amended findings, which is not appealable, or for a new trial, which is appealable, we have said that the order is appealable, C. I. T. Corp. v. Cords, 198 Minn. 337, 269 N. W. 825; Berg v. Veit, 136 Minn. 443, 162 N. W. 522, but have treated the appeal in effect as one from the order only so far as it denied a new trial and bringing up only that part of the order for review, Marty v. Nordby, 201 Minn. 469, 276 N. W. 739; Schaedler v. New York L. Ins. Co. 201 Minn. 327, 276 N. W. 235. The difference between the instant and the cited cases is that in the instant case the appeals in question are from the judgment, which is appealable, and the order denying the alternative motions, which is not appealable, and that in the cited cases each of the appeals was from an order denying alternative motions for amended findings, which was not appealable, or a new trial, which was appealable.

By analogy in the instant case we ought to separate the part of the appeal which relates to the judgment, which is appealable, from the part which relates to the order, which is not appealable, and sustain the appeal as to the judgment and disregard it as to the order. In that view the motion to dismiss ought to be and is denied as to each appellant whose appeal included both the judgment and order in one appeal.

■ Appellants contend that the permit was properly refused upon the grounds that the commission is prohibited by L. 1933, c. 170, § 4, from issuing a permit to a motor transportation company the stock of which is owned by a railroad, and that if the instant case does not come under § 4 the proposed operation is that of a common carrier between fixed termini or over a fixed

route, which is prohibited unless the motor carrier first obtains from the commission a certificate of public convenience and necessity under L. 1925, c. 185. Respondent maintains that § 4 prohibits (1) the issuance of a permit "directly" to a railroad, and (2) the owning, leasing, operating, or control by stock ownership or otherwise of a motor carrier by a rail carrier, but does not prohibit the issuance of a permit to a contract carrier the stock of which is owned by a railroad.

Section 4, so far as here material, reads as follows:

"No permit shall be issued to any common carrier by rail, whereby said common carrier will be permitted to operate trucks for hire within this state, nor shall any common carrier by rail be permitted to own, lease, operate, control, or have any interest whatsoever in any common carrier by truck either by stock ownership or otherwise, directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner; provided, however, that nothing in this Act shall prevent the railroad and warehouse commission from issuing a permit to a common carrier by rail, whereby such carrier will be given authority to operate trucks wholly within the limits of any municipality or municipalities served by the said railroad and which service shall only be a service supplementary to the rail service now established by such carrier."

The first clause absolutely prohibits the granting of a permit to a railroad to operate trucks for hire within the state. The third clause, which is a proviso, authorizes the granting of a permit directly to a railroad to operate trucks in any municipality served by the railroad as a supplement to the rail service.

Respondent contends that the words "common carrier" as used in the second clause of the sentence in § 4 mean a common carrier and not a contract carrier as defined in the act. A common carrier is defined by § 1(f) of the act to mean "any person who holds himself out to the public as willing to undertake for hire to transport from place to place over the public highways of this state the property of others who may choose to employ him, but

who does not operate between fixed termini or over a regular route and is not subject to Laws 1925, Chapter 185." A contract carrier is defined by § 1(g) as "any person engaged in the business of transporting property for hire over the public highways of this state, other than as a common carrier." Section 1(e) defines the words "for hire" as meaning "for remuneration or compensation of any kind, paid or promised, either directly or indirectly for the transportation of property on the highways," but provides that the words shall not apply to any occasional accommodation service by a person or corporation not in the transportation business.

The argument that respondent is not a common carrier as defined in subsection (f) is based upon the proposition that it is not a common carrier in fact, and that, if it were, the qualifying words of the definition that the term "common carrier" shall not mean a person who operates between fixed termini or over a fixed route exclude respondent as proposing just such an operation. It claims that it is a contract carrier as defined in subsection (g) so as to be within c. 170 and not subject to L. 1925, c. 185.

Appellants point out that the first sentence of § 1 provides that the words are to have the statutory meaning "unless the language or context clearly indicates that a different meaning is intended." In the instant case they contend that the context clearly shows that the words "common carrier" mean a contract carrier or at least a carrier of the kind to which a permit could be issued under the act.

If that contention is not sustained, they contend that respondent is a common carrier by motor transportation operating over public highways between fixed termini or over a fixed route, and as such subject to regulation under L. 1925, c. 185, § 5(a), which provides that no motor common carrier shall engage in such business without first having obtained from the commission a certificate of public convenience and necessity. The term "common carrier" is not defined in c. 185. It must be taken in c. 185, therefore, to have its ordinary and accepted meaning. It is urged in

that view that respondent comes squarely within c. 185 as a common carrier operating between fixed termini and over a regular route.

The history of c. 185 and c. 170 was traced in our decision in North Shore F. & F. Co. v. North Shore B. M. T. Assn. 195 Minn. 336, 343, 263 N. W. 98, where we pointed out that the purpose of the statutes is to regulate transportation by motor vehicles upon public highways; that L. 1925, c. 185, proved inadequate to accomplish such purpose for the reason that its scope was so limited by the provisions restricting its application to common carriers operating between fixed termini or over a regular route that other common and all contract carriers were not subjected to regulation; that L. 1933, c. 170, was enacted to remedy the situation by providing for the regulation of certain common carriers (*i. e.,* those not operating between fixed termini or over a regular route) and contract carriers which were not regulated by c. 185, and that c. 170 was to be construed as supplementing and complementing c. 185.

It is hardly to be thought that the regulations contained in c. 185 were to be duplicated in c. 170. Those in c. 170 were to be different in kind and scope and were designed to occupy a field left vacant by c. 185. It is clear, as has been stated, that c. 185 regulated common carrier operations by motor transportation between fixed termini or over a fixed route. It seems reasonably clear that c. 170 was intended not to cover that ground again, but to regulate carriers who remained unregulated under c. 185, *viz.,* contract carriers and common carriers not operating between fixed termini or over a regular route.

It is undisputed that the proposed operations of respondent are between fixed termini or over a regular route. The dispute is as to its carrier character—that is, whether its proposed operation is that of a common or contract carrier. If the operation is that of a common carrier, it comes squarely within L. 1925, c. 185, since it is also to be between fixed termini or over a regular route. In that event respondent could engage in the proposed operation

only upon first obtaining from the commission a certificate of public convenience and necessity under c. 185. It could not engage in that business as a contract carrier under c. 170. The commission was without authority to issue a contract carrier permit under c. 170 to authorize a common carrier operation requiring a certificate of public convenience and necessity under c. 185.

We do not deem it necessary to define the term "common carrier" for all purposes. The statutory definition under c. 170, § 1(f), without the qualifying clause is substantially the same as the commonly accepted meaning of the words. A common carrier is one who undertakes for hire or reward to transport from place to place the goods of such as choose to employ him. The term includes those who participate in such transportation when their service involves the custody and control of the property and constitutes an essential part of the transportation, although they may have no dealings directly with consignors or consignees and move the goods under the bills of lading and transportation contracts of the common carrier undertaking the transportation. By agreeing to perform a part of the common carrier transportation, the connecting or participating carrier holds itself out as undertaking to transport for hire or reward the goods of those who might choose to hire it through the carrier undertaking the entire operation.

Numerous decisions show that both the railroad and respondent are to be regarded as common carriers under the proposed operation. The rule stated has been applied to carriers by motor transportation over public highways, terminal carriers by rail and water, belt lines, stockyards, and wharves.

In Baldwin v. State Corporation Comm. 143 Kan. 580, 56 P. (2d) 453, a motor transportation operation similar to that in the instant case by a motor carrier under a contract with the trustees of the Missouri Pacific Railroad Company was held to be a common carrier operation requiring authorization under a certificate of public convenience and necessity under a statute similar to L. 1925, c. 185, although the motor carrier was neither owned nor

controlled by the railroad, except insofar as the contract gave the railroad such control. Decision was based upon the nature of the service rendered. The court held that the transportation was that of a common carrier which the railroad undertook and of which the motor carrier operation was a part. The fact that the motor carrier had no dealings with shippers or consignees and moved the freight under the railroad's bills of lading was held to show that the motor carrier transportation was a component part of the common carrier transportation undertaken by the railroad.

In New York Cent. R. Co. v. Public Utilities Comm. 121 Ohio St. 588, 170 N. E. 574, a motor transportation operation similar to that in the instant case was held to be a common carrier service under a statute similar to L. 1925, c. 185. In the cited case the railroad did not own the motor carrier but had a contract with it by the terms of which the railroad company secured to it the exclusive service of the motor carrier in the railroad's business. While the railroad did not own the trucks and trailers, it totally controlled their operation under the contract. It directed the property to be conveyed; it determined the times when and the route over which the trucks should travel; it retained the complete supervision of their operation; the transportation was a consummation of contracts between the railroad and shippers, and the property was moved under the bills of lading of the railroad. The court held that under the arrangement the railroad had made the truck operation a part of its common carrier business, and said [121 Ohio St. 597]:

"By the use of these trucks the New York Central Railroad Company cannot and has not divested the carriage of the features of a common carrier transaction. It still holds itself out to the public as a common carrier of this freight, which it transports upon motor vehicles. It receives this freight in exactly the same way at its freight stations that all other freight transported by its railroad is received. As between the public and the New York Central Railroad Company the transaction differs in no essential from transportation by rail. Hence the New York Central Rail-

road Company under this record is not only a common carrier for hire, but with reference to this particular freight it is a common carrier for hire, and the contract of carriage never ceases to be a contract of common carriage."

The cited motor carrier cases are decisive of the instant case. The law has been exhaustively reviewed in the decisions of the United States Supreme Court and other federal courts in cases which fully sustain the rule applied in the motor carrier cases and show its application in a situation such as is involved here.

In United States v. California, 297 U. S. 175, 181, 56 S. Ct. 421, 423, 80 L. ed. 567, the action was brought by the federal government against the state as the owner and operator of a railroad to recover a statutory penalty for violation of the federal safety appliance law. The question was whether the railroad was a common carrier in interstate commerce. The railroad was operated along the waterfront of San Francisco harbor. It received all freight cars offered to it, loaded and empty, and hauled them at a flat rate per car. The movement was accomplished by its own locomotives and crews over its own tracks. It issued no bills of lading and was not a party to through rates. It moved cars "on instructions contained in 'switch lists' made out by the delivering or receiving carrier," which paid the charge and absorbed it in its rate. Charges on cars not delivered to or received from another carrier were paid by the industry ordering the movement. The court held that the railroad served as "a link" in the through transportation of freight in interstate commerce and that its service was of a public character and for hire. The court said [297 U. S. 182]:

"All the essential elements of interstate rail transportation are present in the service rendered by the State Belt Railroad. They are the receipt and transportation, for the public, for hire, of cars moving in interstate commerce."

Answering the argument that the railroad was not a public carrier for the reason that it maintained no freight station and had

no business transactions with shippers or consignees, neither issuing nor being named in bills of lading, the court said:

"The state insists that the facts that it maintains no freight station, issues no bills of lading, and is engaged only in moving cars for a flat rate instead of at a charge per hundred pounds of freight moved, distinguish the operation of its railroad from that of the Brooklyn Terminal. [United States v. Brooklyn Terminal, 249 U. S. 296, 39 S. Ct. 283, 63 L. ed. 613, 6 A. L. R. 527.] As the service involves transportation of the cars and their contents, the method of fixing the charge is unimportant. * * * And while maintenance of a freight station and the issue of bills of lading may be embraced in the service of a common carrier, and a part of interstate commerce, * * * they are not indispensable adjuncts to either where the subject of transportation, here cars loaded and empty, may be effected without."

In Galveston Wharf Co. v. Galveston H. & S. A. Ry. Co. 285 U. S. 127, 134, 52 S. Ct. 342, 344, 76 L. ed. 659, a wharf company was held to be a common carrier of goods constituting a through water and rail shipment, which had been delivered by the water carrier to the wharf company by unloading the same on its wharf and left there under its control to be handled and forwarded by rail at its convenience, although the wharf company was not named in the bill of lading and was not a party to the through rate charged. The court said that the service of the wharf company "was that of a common carrier furnishing a *necessary link* in the transportation under the through bill of lading" (italics supplied); that it was in law and fact "a connecting carrier"; and that it was unimportant that it was not named in the bill of lading.

In United States v. Brooklyn Terminal, 249 U. S. 296, 304, 305, 39 S. Ct. 283, 285, 63 L. ed. 613, 6 A. L. R. 527, there was a prosecution for violation of the federal hours of service act covering employes engaged in interstate commerce. The defendant was a navigation company, owning docks, float bridges, warehouses, etc., and eight miles of railroad track. Its business was to receive and

deliver at railroad termini for railroads in interstate commerce freight in cars and in less-than-carload lots under separate contracts with the railroads. It moved the cars and freight by its own locomotives and with its own crews. In addition, it acted as receiving and delivering agent of freight for the railroads. In holding that the defendant was a common carrier, the court said that, while the instrumentalities employed by the navigation company were not under common ownership or management with those of the railroad, they were "used as an integral part of each railroad line"; that the services rendered were "public in their nature"; and that the fact that such service was rendered indirectly by the terminal company instead of directly by the railroads did not change the essential character of the transportation as being by a common carrier in interstate commerce. Further, it was held that the terminal company was not prevented from being a common carrier by the fact its transportation was done under contracts with the railroads. That the company acted as the agent of the railroads was held not to change the character of the service rendered. The court said [249 U. S. 306]:

"But a common carrier does not cease to be such merely because the services which it renders to the public are performed as agent for another."

Stockyard companies operating under substantially the same arrangements with railroads as this respondent have been held to be common carriers under the rule. United States v. Union Stock Yard & Transit Co. 226 U. S. 286, 33 S. Ct. 83, 57 L. ed. 226; Union Stockyards Co. of Omaha v. United States (8 Cir.) 169 F. 404; United States v. St. Joseph Stockyards Co. (D. C.) 181 F. 625; United States v. N. P. Terminal Co. (C. C.) 181 F. 879. In the Union Stockyards of Omaha case, Mr. Justice Van Devanter, then a circuit judge, used language which has been quoted with approval in subsequent cases, among which are United States v. Union Stock Yard & Transit Co. 226 U. S. 286, 305, 33 S. Ct. 83, 57 L. ed. 226, *supra*, and Waldum v. Lake Superior T. & T. Ry.

Co. 169 Wis. 137, 148, 170 N. W. 729, a part of which reads as follows [169 F. 406]:

"The carriage of these shipments from the transfer track to the sheds or pens and vice versa is no less a part of their transit between their points of origin and destination than is their carriage over any other portion of the route. * * * And it is of little significance that the stockyards company does not hold itself out as ready or willing generally to carry live stock for the public, for all the railroad companies at South Omaha do so hold themselves out, and it stands ready and willing to conduct, and actually does conduct, for hire a part of the transportation of every live stock shipment which they accept for carriage to or from that point, including such shipments as are interstate."

The Wisconsin court held that a railroad and terminal company was a common carrier where the plan of operation was similar to that involved here. Waldum v. Lake Superior T. & T. Ry. Co. 169 Wis. 137, 170 N. W. 729, *supra.*

We have examined with care the cases cited by respondent. We do not deem any of them to be controlling. The case of Motor Freight, Inc. v. Public Utilities Comm. 120 Ohio St. 1, 165 N. E. 355, is distinguished on its facts in New York Cent. R. Co. v. Public Utilities Comm. 121 Ohio St. 588, 601, 170 N. E. 574, *supra.* It would unduly encumber the opinion to review the others.

Our conclusion is that the order of the commission should be sustained and that the judgment of the district court on appeal from the commission should be reversed.

The motion to dismiss is granted as to certain appeals and denied as to others, as indicated in the opinion.

The judgment is reversed.

MR. JUSTICE STONE took no part.